**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 13, 2009

Charles R. Fulbruge III
Clerk

No. 08-30268

TIDEWATER INC. AND SUBSIDIARIES; TIDEWATER FOREIGN SALES
CORPORATION

Plaintiffs - Appellees

v.

UNITED STATES OF AMERICA

Defendant - Appellant

-------------------------------------------------------------------------------------------------

TIDEWATER INC. AND SUBSIDIARIES

Plaintiffs - Appellees

v.

UNITED STATES OF AMERICA

Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana

Before JOLLY, DAVIS, and DeMOSS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

The United States of America appeals from the district court's grant of
summary judgment in favor of Tidewater Inc. and its related entities. The issue
in this tax case is whether Tidewater, which owns and operates a fleet of vessels

serving the energy industry, is entitled to certain FSC tax benefits under the Internal Revenue Code. The resolution of this issue depends on whether the time charter of Tidewater's vessels to energy industry customers should be considered a "lease" or a "service agreement." We agree with the district court that the time charters should be considered more like a lease or sublease than a service agreement and affirm the district court's judgment.

## I. *Facts and Prior Proceedings*

Tidewater Inc. and its subsidiaries ("Tidewater") own and operate ocean-going vessels serving the offshore energy industry in foreign and domestic waters. For the years in question, 1998-2000, Tidewater structured its vessel operations as a two-step transaction. It first bareboat chartered a vessel to a Tidewater operating company. The operating company then time chartered that vessel to the customer, usually an oil company (the "Time Charter").[1] Under the Time Charter, the Tidewater operating company yielded significant control over the vessel to the customer and also provided a crew to operate the vessel.

The operating company allocated the income received under the Time Charter between the leasing component and the service component of the Time Charter. The Time Charter was silent as to any such allocation.[2] Tidewater entered into hundreds of these Time Charters, five of which are in the record. Tidewater Foreign Sales Corporation ("Tidewater FSC") acted as a commission agent for these transactions and Tidewater paid Tidewater FSC a commission on the amount allocated to the leasing component of the Time Charter.

---

[1] The Time Charters are on the "Uniform Time Charter Party for Offshore Service Vessels, Code Name: Supplytime 89" form. This form is issued by The Documentary Committee of The Baltic and International Maritime Council (BIMCO), Copenhagen. The first edition was published in 1975, and this version of the form was revised in 1989.

[2] The amount attributed to the leasing component was paid by the Tidewater operating company to the vessel owner as charter hire on the bareboat charter.

The provisions of the I.R.C. relating to Foreign Sales Corporations ("FSC")[3] allow qualified taxpayers to deduct commissions paid to a FSC. The income derived from these commissions is then taxable to the FSC at a favorable rate. To qualify for these tax benefits, the FSC must derive the commissions from income generated by the sale or lease of "export property." Based on its conclusion that the Time Chartered vessels qualified as "export property," Tidewater deducted the commissions paid to Tidewater FSC on its 1998 - 2000 tax returns, and Tidewater FSC claimed the favorable rate on the commissions on its returns.

The IRS contended that the vessels were not "export property" under the FSC provisions, and that therefore the favorable tax treatment was inapplicable. For this reason, the IRS disallowed Tidewater's commission deductions for 1998 - 2000. Tidewater paid the calculated deficiencies and filed this suit. Tidewater FSC filed protective refund claims and joined in this suit. It argued in the alternative, that if Tidewater was not allowed to deduct the commissions paid to Tidewater FSC, Tidewater FSC was not required to include those commissions in its taxable income.

The parties filed cross-motions for summary judgment. Tidewater argued that the Time Charter has attributes of both a service contract and a lease, and that the lease aspects of the contract are sufficient to allow the vessels to be classified as export property. The government argued that the Time Charter is a service contract. The district court agreed with Tidewater and granted its summary judgment motion. The district court reasoned that the FSC provisions contemplated hybrid contracts, and that having both elements of a lease and a service contract did not prevent the Time Charter from being characterized as

---

[3] 26 U.S.C. §§ 921-927. The provisions were repealed in November 2000.

a lease. It concluded that the vessels met the definition of export property, and that Tidewater's deductions were proper. The United States now appeals.

## II. *Analysis*

### A. Statute and Regulation

The central issue in this appeal is whether the vessels Tidewater time chartered to its customers qualify as "export property." We turn first to the relevant provision of the I.R.C. and the relevant treasury regulation that control our analysis. The FSC provisions define export property as follows:

> § 927**(a) Export property**. For purposes of this subpart
> **(1) In general**. The term "export property" means property
>
> > **(A)** manufactured, produced, grown, or extracted in the United States by a person other than a FSC,
> >
> > **(B)** held primarily for sale, lease, or rental in the ordinary course of trade or business, by, or to, a FSC, for direct use, consumption, or disposition outside the United States, and
> >
> > **(C)** not more than 50% of the fair market value of which is attributable to articles imported into the United States.

26 U.S.C. § 927(a) (2000). In this case, the parties agree that the vessels meet the requirements of § 927(a)(1)(A) and (a)(1)(C). Only § 927(a)(1)(B) is in question, as the definition of export property goes on to state:

> **(2) Excluded property.** The term "export property" shall not include
> > **(A)** property leased or rented by a FSC [or through a commission FSC] for use by any member of a controlled group of corporations of which such FSC is a member . . . .

*Id*. The Tidewater entities that own the vessel and operate the vessel are members of a controlled group of corporations with Tidewater FSC. Therefore this provision excludes the Tidewater vessels as "export property."

However, a gloss in the treasury regulations on this statutory exclusion provides Tidewater with a basis for an argument that these vessels are indeed export property:

> **(2) Property leased to a member of controlled group- (I) In general.** Property leased to a person (whether or not the FSC) which is a member of the same controlled group as the lessor constitutes export property for any period of time only if during the period
>
> > (A) The property is held for sublease or is subleased, by the person to a third person for the ultimate use of the third person.
> > (B) The third person is not a member of the controlled group; and
> >
> > (C) The property is used predominantly outside the United States by the third person.

Temp. Treas. Reg. § 1.927(a)-1T(f)(2) (1998). The bareboat charter of the vessel from the vessel owner to the Tidewater operating company amounts to a lease, so if the Time Charter to the customer is a sublease, Tidewater is entitled to the deduction. Therefore, the question narrows to whether the Time Charter to the customer is a sublease.

B. Standard of Review

We review the district court's grant of summary judgment *de novo*. *Patterson v. Mobil Oil Corp.*, 335 F.3d 476, 485 (5th Cir. 2003). Summary judgment is proper if it can be shown "that there is no genuine issue as to any material fact." FED. R. CIV. P. 56(c). "On cross-motions for summary judgment, we review each party's motions independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 499 (5th Cir. 2001). The parties agree that no question of fact is presented in this case and that the sole issue presented is legal.

C. Criteria to Use in Determining Status of Vessels

In determining whether the vessels qualify as "export property," we look to the governing statute, § 927, and the regulation interpreting the statute. On its face, the governing regulation allows Tidewater and Tidewater FSC the benefit of the FSC deduction if "the property is held for sublease or is subleased, by the person to a third person for the ultimate use of the third person." Temp. Treas. Reg. § 1.927(a)-1T(f)(2)(A)(1998). The statute, § 927(a)(1)(B), requires that the property be held "primarily" for lease in order to qualify as export property. While the language of the treasury regulation does not contain the word "primarily," the regulation cannot change the terms of the statute. *See Nalle v. Comm'r*, 55 F.3d 189, 193 & n.11 (5th Cir. 1995) ("[I]f a regulation obviously altered the scope of the relevant statute, the Commissioner should have known that such a regulation was invalid." (citing *Comm'r v. Acker*, 361 U.S. 87, 92-94 (1959) (parenthetical omitted))). The definition of export property carried forward in the regulations implicitly retains the word "primarily." Therefore, our analysis will focus on whether the vessels were held by the Tidewater operating company primarily for sublease to a third party.

Although the relationship of the parties in this case is controlled by the contracts between the parties, we begin with a consideration of the generally accepted definitions of the terms in play. "As a general matter, the term 'lease' means a transfer of the right to possession and use of goods for a term in return for consideration." 19 WILLISTON ON CONTRACTS § 53:18 (4th ed. 1991). A service contract is defined simply as "a contract to perform a service . . . ." BLACK'S LAW DICTIONARY 324 (7th ed. 1999). A time charter is defined generally as "[a] charter for a specified period, rather than for a specific task or voyage; a charter under which the shipowner continues to manage and control the vessel, but the charterer designates the ports of call and the cargo carried." *Id.* at 229. As opposed to a voyage charter, which is for one voyage from point A to point B, a

time charter is "an arrangement of some permanency." GRANT GILMORE & CHARLES L. BLACK, JR., THE LAW OF ADMIRALTY, § 4-14, at 229 (2d ed. 1975).

While these general definitions are a logical starting point, the terms of the Time Charter itself controls the critical question as to whether the Time Charter is more like a lease or a service agreement. Under the Tidewater Time Charter, the customer can direct the vessel to undertake any voyage permitted by the terms of the agreement. The Time Charter covers a named vessel with specified capabilities, and while Tidewater has the right to provide a substitute vessel at any time, the customer must give its reasonable consent.[4] If the substitute vessel is not acceptable, the customer can refuse to accept it. The full capacity of the vessel is placed at the customer's disposal for use as it sees fit, and the customer can require special towing or anchor handling equipment or modify the vessel. In sum, the customer is given the full use of the vessel and the right to direct the vessel in all respects: when and where the vessel should go, the cargo it should carry, the passengers to be transported, and in other ways as set forth in the Time Charter.

The government argues that the provisions of 26 U.S.C. § 7701(e) provide the proper framework for determining if the Time Charter is more like a lease or a service contract. Section 7701 is entitled "Definitions," and §7701(e) provides criteria for determining when a contract should be treated as a lease. Based on legislative history, Tidewater argues that § 7701(e) does not apply to the FSC provisions and that it only applies to investment tax credit issues. Tidewater's argument is inconsistent with the plain language of the statute. which states that the provisions apply for purposes of chapter 1. When the plain language of a statute is unambiguous, there is no need to resort to legislative

---

[4] "The Owners shall be entitled at any time, whether before delivery or at any other time during the Charter Period, to provide a substitute vessel, subject to the Charterer's prior approval, which shall not be unreasonably withheld." Part II, Clause 18, Time Charter.

history for aid in its interpretation. *See Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 169 (5th Cir. 2000). Here, the prefatory language of § 7701 clearly requires its application to all parts of Chapter 1, which includes the FSC provisions. Section 7701(e) reads:

> § 7701 **(e) Treatment of certain contracts for providing services, etc.** For purposes of chapter 1
>
>> (1) **In general.** A contract which purports to be a service contract shall be treated as a lease of property if such contract is properly treated as a lease of property, taking into account all relevant factors, including whether or not
>>
>>> (A) the service recipient is in physical possession of the property,
>>>
>>> (B) the service recipient controls the property,
>>>
>>> (C) the service recipient has a significant economic or possessory interest in the property,
>>>
>>> (D) the service provider does not bear any risk of substantially diminished receipts or substantially increased expenditures if there is nonperformance under the contract,
>>>
>>> (E) the service provider does not use the property concurrently to provide significant services to entities unrelated to the service recipient, and
>>>
>>> (F) the total contract price does not substantially exceed the rental value of the property for the contract period.
>>
>> (2) **Other arrangements.** An arrangement (including a partnership or other pass-thru entity) which is not described in paragraph (1) shall be treated as a lease if such arrangement is properly treated as a lease, taking into account all relevant factors including factors similar to those set forth in paragraph (1).

26 U.S.C. § 7701(e) (2000). Although the Time Charter in this case does not "purport[] to be a service contract," the factors set forth in § 7701(e)(1) are

relevant because § 7701(e)(2) requires the same analysis for other contractual arrangements that may be "properly treated as a lease," such as the Time Charter. Both § 7701(e)(1) and (e)(2) state that the factors are not exclusive and that "all relevant factors" must be considered.

Before applying these individual factors to the Time Charter and considering any other relevant factors, we observe that § 7701(e) establishes a balancing test. This requires us to consider all pertinent information and determine whether, on balance, the Time Charter is more like a lease or a service contract. Section 7701(e) gives no guidance as to the weight to be given to these factors: that determination is left to the court's discretion.

D. Application of §7701(e)

1. *Was the customer in physical possession of the vessel?*

Under the Time Charter, Tidewater delivered the vessel to the customer at a specified port within a certain time period.[5] At the end of the charter period, the vessel was redelivered to Tidewater "free of cargo and with clean tanks" at a specified port.[6] While Tidewater provided a crew that manned the vessel at all times,[7] the vessel and crew were under the general direction and control of the customer. The government argues that the Tidewater crew operated the vessel and therefore it remained in Tidewater's possession. While the crew had physical possession of the vessel, the customer had significant control over the

---

[5] The Time Charter refers to the Tidewater operating company as "Owner" and the third party customer as "Charterer." "[T]he Vessel shall be delivered by the Owners free of cargo and with clean tanks at any time between the date stated in Box 5 and the date specified in Box 6 at the port or place stated in Box 7 where the Vessel can safely lie always afloat." Part II, Clause 2(a), Time Charter.

[6] "The Vessel shall be redelivered on the expiration or earlier termination of this Charter Party free of cargo and with clean tanks at the port of place as stated in Box 8(I) or such other port or place as may be mutually agreed." Part II, Clause 2(d), Time Charter.

[7] "The Owners shall provide and pay for all provisions, wages and all other expenses of the Master, Officers and Crew. . . ." Part II, Clause 7, Time Charter.

vessel and the crew, particularly as to when and where the vessel traveled. This control was sufficient to give the customer constructive possession of the vessel. Although Tidewater's crew was in physical possession of the vessel, this fact is relatively unimportant in light of the customer's constructive control of the vessel.

### 2. Did the customer control the vessel?

During the charter periods, the vessel and its crew were at the beck and call of the customer. The customer directed the movement of the vessel, cargo, and passengers. So long as these directives were safe and within the vessel's capabilities, the master and crew were required to fulfill them.[8] The customer could, at its own discretion, lay up the vessel at a safe port for all or any portion of the charter period,[9] or terminate the Time Charter at any time.[10] The customer also had the right to sublet, assign, or loan the vessel to other entities so long as they were not competitors of Tidewater.[11] Furthermore, the customer

---

[8] Part II, Clause 5(a), Time Charter ("The Vessel shall be employed in offshore activities which are lawful in accordance with the law of the place of the Vessel's flag and/or registration and of the place of operation"), Part II, Clause 6(d), Time Charter ("The Vessel will be operated and the services hereunder will be rendered as requested by the Charterers, subject always to the exclusive right of the Owners or the Master of the Vessel to determine whether operation of the Vessel may be safely undertaken."), Part II, Clause 20, Time Charter ("The Vessel shall not be ordered nor bound to enter without the Owners' written permission" any dangerous port.).

[9] "The Charterers shall have the option of laying up the Vessel at an agreed safe port or place for all or any portion of the Charter Period in which case the Hire hereunder shall continue to be paid . . . ." Part II, Clause 5(d), Time Charter. One of the five sample Time Charters, that for the *Regent Seahorse*, eliminates this provision, however it retains all other provisions regarding control of the vessel. The period of this Time Charter was only for three days. Even if we were to examine only this contract, the elimination of this one provision in a contract of this duration would not change our conclusion that the contract is a lease.

[10] "The Charterers may terminate this Charter Party at any time by giving the Owners written notice as stated in Box 15 and by paying the settlement statement stated in Box 14 and the demobilisation charge stated in Box 16 . . ." Part II, Clause 26(a), Time Charter.

[11] "The Charterers shall have the option of subletting, assigning or loaning the Vessel to any person or company not competing with the Owners, subject to the Owners' prior

had the right to make structural alterations to the vessel and to install additional equipment as it saw fit.[12] While the rights to sublet and alter the vessel were both subject to Tidewater's prior consent, such consent was not to be unreasonably withheld.

Thus under the Time Charter, the customer had control of the vessel in the most important sense of the word. While the crew retained control over the details of routine operation and maintenance of the vessel, this type of control is far less important than the type of control exercised by the customer. Therefore, this factor weighs in favor of the Time Charter being a lease.

> *3. Did the customer have a significant economic or possessory interest in the vessel?*

Under the Time Charter, Tidewater was responsible for costs of the vessel's maintenance, insurance, and all costs associated with the crew.[13] Tidewater bore the risk of loss if anything happened to the vessel. The customer's only risk of loss was limited to its cargo[14] and any special towing or anchor handling equipment it required on the vessel.[15] The customer did share

---

approval which shall not be unreasonably withheld. . . ." Part II, Clause 17(a), Time Charter.

[12] "The Charterers shall have the option of, at their expense, making structural alterations to the Vessel or installing additional equipment with the written consent of the Owners which shall not be unreasonably withheld . . . ." Part II, Clause 23, Time Charter. The Time Charter for the *Gulf Squall* eliminates this provision, however, the elimination of this one provision does not, in our view, lessen the control of the customer over the vessel. *See supra* note 10.

[13] "The Owners shall provide and pay for all other expenses of the Master, Officers and Crew; all maintenance and repair of the Vessel's hull . . .; also, except as otherwise provided in this Charter Party, for all insurance on the Vessel." Part II, Clause 7, Time Charter.

[14] "Owners shall not be responsible for loss of, damage to, or any liability arising out anything towed by the Vessel, any cargo laden upon or carried by the Vessel or her tow, the property of the Charterers or of their contractors and sub-contractors." Part II, Clause 12(b), Time Charter.

[15] Upon request by the customer, the equipment was placed on the vessel at Tidewater's expense. If the equipment was damaged or unusable due to any reason other than Tidewater's

11

in some of the benefits of any reduction in operating costs, as the customer paid many of the day to day operating costs of the vessel, such as fuel and dock fees.[16] While the customer shared in these limited savings, the primary economic and possessory interest in the vessel remained with Tidewater. This factor weighs against the Time Charter being a lease.

### 4. Did Tidewater bear the risk of substantially diminished receipts if there was nonperformance under the Time Charter?

The Time Charter required the customer to "pay Hire for the Vessel . . . per day or pro rata for part thereof from the time that the Vessel is delivered to the Charterers until the expiration or earlier Termination of the Charter Party." Part II, Clause 10(a), Time Charter. The payment of hire was suspended for any period the vessel was unable to function "as a result of any deficiency of Crew or of the Owners' stores, strike of Master, Officers and Crew, breakdown of machinery, damage to hull or other accidents to the Vessel." Part II, Clause 11(a), Time Charter. If the vessel could not perform due to the customer's actions, such as damage caused by transporting dangerous or hazardous cargo or caused by directing the vessel through ice, the payment of hire was not

---

negligence, "the Charterers shall either provide, or direct the Owners to provide, an equivalent replacement at the Charterers' expense." Part II, Clause 7(b), Time Charter.

[16]    While the Vessel is on hire the Charterers shall provide and pay for all fuel, lubricants, water, dispersants, firefighting foam and transport thereof, port charges, pilotage and boatmen and canal steersmen (whether compulsory or not), launch hire (unless incurred in connection with the Owners' business), light dues, tug assistance, canal, dock, harbour, tonnage and other dues and charges, agencies and commissions incurred on the Charterers' business, costs for security and other watchmen, and of quarantine (if occasioned by the nature of the cargo carried or the ports visited whilst employed under this Charter Party but not otherwise.

Part II, Clause 8(a), Time Charter.

suspended.[17]    Therefore, Tidewater bore most of the risk of vessel nonperformance under the Time Charter, and Tidewater has conceded that this factor weighs in favor of the Time Charter being more like a service contract.

> 5. *Did Tidewater use the vessel concurrently to provide services to other customers?*

Tidewater did not use the vessel for any other customer or its own purposes during the term of the Time Charter. Under the Time Charter, "[t]he whole reach and burden and decks of the Vessel shall throughout the Charter Period be at the Charterer's disposal." Part II, Clause 5(c), Time Charter. Tidewater was allowed only "proper and sufficient space for the Vessel's Master, Officers, Crew" and necessary equipment and provisions. *Id*. Thus the customer had the full use and enjoyment of the vessel during the period of the Time Charter, and this factor supports finding that the Time Charter is more like a lease.

---

[17] "Hire shall not cease in the event of the Vessel being prevented from working as aforesaid as a result of:

(i) the carriage of cargo as noted in Clause 5(c)(iii) and (iv);

(ii) quarantine or risk of quarantine unless caused by the Master, Officers or Crew having communication with the shore at any infected area not in connection with the employment of the Vessel without the consent or the instructions of the Charterers;

(iii) deviation from her Charter Party duties or exposure to abnormal risks at the request of the Charterers;

(iv) detention in consequence of being driven into port or to anchorage through stress of weather or trading to shallow harbours or to river or ports with bars or suffering an accident to her cargo, when the expenses resulting from such detention shall be for the Charterers' account howsoever incurred;

(v) detention or damage by ice;

(vi) any act or omission of the Charterers, their servants or agents

Part II, Clause 11(a), Time Charter.

*6. Did the price of the Time Charter substantially exceed the rental value of the vessel?*

If the amount Tidewater received under the Time Charter substantially exceeded the rental value of the vessel without any charge for services, it indicates that payment was made not only for the lease of the vessel but for services as well. Tidewater conceded that the amount received under the Time Charter included sums attributable to the crew and other expenses and allocated those amounts accordingly. Therefore, this factor weighs in favor of the Time Charter being more like a service contract.

## III. *Conclusion*

Our task is to decide whether the Time Charter between the Tidewater operating company and its customer is more like a lease or a service contract. We must make this determination because the Time Charter has attributes of both a lease and a service contract.[18] Section 7701(e) does not specify the weight to be given to its factors; we must therefore determine the weight each factor deserves. We conclude that the crucial issue is whether Tidewater or the customer has control of the vessel. As stated above, a lease provides the use of property to a customer, while a service contract provides a service. Here, the charterer customer maintains control over every aspect of the use of the vessel. In our view this is more important than the operational control exercised by the

---

[18] Tidewater argues that we should look to the previous "two-contract" arrangement used by Tidewater before it employed the 1989 form of Time Charter as evidence that the Time Charter is more like a lease. Under the previous system, the customer entered into two contracts with Tidewater entities: one bareboat charter was entered into between the owning entity and the customer, and a separate contract for services was entered into between the customer and the operating entity. Tidewater argues that while the paperwork has changed, the substance of the arrangement with the customer is unchanged. However, Tidewater and the customer have modified the structure of the transaction by eliminating the bareboat charter to the customer. "[W]hile a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice." *Comm'r v. Nat'l Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974). We must evaluate the tax consequences of the arrangement as it was structured for the years in question.

vessel's crew. It is also more important than Tidewater's risk of loss and risk of nonperformance.

Thus, under the facts of this case, we are satisfied that control is the most important criterion enumerated in § 7701(e)(1), and that the significant control the time charterer exercises makes the Time Charter more like a lease than a service agreement. If a Tidewater employee leased a vehicle from Avis and operated it himself, this contract, like a bareboat charter, would be a classic lease. If, on the other hand, the vehicle was leased with a driver employed by Avis, and the car and driver were at the beck and call of the lessee, the control the of lessee over the vehicle in this latter arrangement is reduced very little, and is still more like a lease than a service agreement. We see very little difference in principle between the lease of a car with a driver and Tidewater's Time Charter.

Therefore, when we weigh the § 7701(e) factors in this light, we conclude that the Time Charter is more like a lease than a service agreement. The district court's order granting summary judgment is therefore

AFFIRMED.