**GLOBAL CROSSING BANDWIDTH, INC., a California Corporation, Plaintiff,**

v.

**LOCUS TELECOMMUNICATION, INC., a Delaware Corporation, Defendant.**

No. 06–CV–6078L.

United States District Court, W.D. New York.

July 10, 2009.

226

Eric A. Linden, Jaffe, Raitt, Heuer & Weiss, P.C., Southfield, MI, for Plaintiff.

Charles H. Helein, Helein & Marashlian, LLC, McLean, VA, Eugene Welch, Harris, Chesworth, O'Brien, Johnstone, Welch & Leone, Rochester, NY, for Defendant.

## DECISION AND ORDER

DAVID G. LARIMER, District Judge.

Plaintiff, Global Crossing Bandwidth, Inc. ("Global"), brings this diversity action against Locus Telecommunications, Inc. ("Locus"), seeking damages occasioned by Locus's alleged breach of a contract for telecommunications services between Global and Locus. Locus in turn has asserted several counterclaims against Global.

Both Global and Locus have moved for summary judgment. *See* Dkt. # 40, # 47. For the reasons that follow, Global's motion is granted in part and denied in part, and Locus's motion is granted in part and denied in part.

## FACTUAL BACKGROUND

Global is a California corporation with its principal place of business in New York. Locus is a Delaware corporation with its principal place of business in New Jersey.

On May 26, 2000, Global and Locus entered into a carrier service agreement ("Agreement"), by which Global agreed to provide, and Locus agreed to purchase, network transport and other telecommunications services for one year. Complaint Ex. A. The Agreement was amended and extended several times, and was eventually continued on a month-to-month basis. *Id.*

At various times during the parties' contractual relationship, disputes arose about certain matters, the particulars of which will be addressed later in this decision. At least in part because of those disputes, on October 6, 2005, Nelson Gomez, Locus's Senior Director of Risk Management, sent Global a letter informing Global of Locus's intention to terminate the Agreement effective January 5, 2006. Gomez added that "Locus will continue to abide by its obligations under the Agreement until the Termination Date." Dkt. # 48–3 ¶ 29 and at 26.

On November 29, 2005, Global sent Locus a letter which stated, in part, "This letter serves as a notice of default for Locus Telecommunications, Inc." *Id.* ¶ 20 and at 19. The letter stated that there was a past-due balance on Locus's account of over $1.6 million, which Global said "must be paid within 48 hours." The letter also stated that if Locus did not "cure

this breach" by paying that amount in full by 5:00 p.m. on Thursday, December 1, 2005, Global "may pursue its remedies" under the Agreement. Global added that those remedies "may include service termination" and that "[s]hould termination result, Global Crossing will immediately terminate services as of 5:00 PM EDT Thursday, December 1...." *Id.*

In a second letter dated the next day, November 30, 2005, however, Global informed Locus that "Global Crossing hereby revokes the Notice of Default served upon Locus Telecommunications, Inc. on November 29, 2005 and serves this notice in its place." *Id.* ¶ 22 and at 21.[1] That letter stated that "[a]lthough [Locus's] account ... has a total past due balance greater than $915,140.14, this is the amount that must be paid by 5:00 PM EST Monday, December 5, 2005." Except for the change of date from December 1 to December 5, the letter contained language identical to that in the November 29 letter concerning the possibility that Global might pursue its available remedies, including immediate termination of its services.

It appears that the parties may have made some attempt to resolve their disputes, but those efforts were not successful, and the Agreement, and Global's services under the Agreement, were terminated.[2]

Global commenced this action on February 6, 2006. The complaint asserts four causes of action, the first three of which seek $1.9 million in damages. The first

---

1. From the copy submitted to the Court by Locus, the letter, though dated November 30, was apparently sent to Locus by fax at 9:27 a.m. on December 1, with a hard copy to follow by courier service. Dkt. # 48–3 at 21. For the sake of convenience, however, this letter will generally be referred to as the "November 30 letter."

2. It is not apparent from the record precisely when Global ceased providing services to Locus under the Agreement. The issue of when the Agreement was effectively terminated, which is in some dispute, is discussed in detail later in this Decision and Order.

cause of action asserts a claim for breach of contract, alleging that Locus failed to pay for services rendered by Global under the Agreement. The second cause of action is premised on theories of quantum meruit, unjust enrichment, and constructive trust, and alleges that Locus has received benefits under the contract for which it has not compensated Global. The third cause of action asserts an account-stated claim based upon Global's invoices to Locus.

The fourth cause of action, captioned "Enforcement of Security Interest," alleges that on August 20, 2001, Global and Locus entered into a security agreement by which Locus gave Global a security interest in Locus's existing and future accounts receivable, contract rights, and other assets, as security for Locus's obligations under the Agreement. *See.* Complaint Ex. C (Dkt. # 1–4). Global alleges that because Locus has breached the Agreement, Global is entitled to enforce the security agreement and take possession of the collateral.

In its answer, Locus has asserted a three-count counterclaim, alleging that Global has improperly or erroneously imposed and sought to collect various charges against Locus. Locus asserts claims for breach of contract, violation of the Federal Communications Act ("FCA" or "Act"), and for attorney's fees under the Act. Locus seeks damages in an amount to be determined at trial.

## PARTIES' MOTIONS

Global contends, first, that Locus's counterclaims are barred by certain events that occurred in the course of Global's bankruptcy proceedings. The relevant facts are described in more detail below, but in short, Global filed for Chapter 11 protection in January 2002, and its bankruptcy plan became effective in December 2003. Global now asserts that the bankruptcy court's confirmation of Global's plan, as well as a certain "cure order" issued by the bankruptcy court during the bankruptcy proceedings, bar all of Locus's counterclaims in this action.

Second, Global asserts that Locus failed to dispute Global's invoices in accordance with the procedures prescribed by the Agreement. Under the terms of the Agreement, Global argues, Locus has thereby waived its right to contest those invoices, and the invoices are binding on Locus.

Global also raises several arguments pertaining to the individual charges in dispute. For instance, Global seeks summary judgment dismissing one of Locus's counterclaims, which is sometimes referred to as the "inbound minutes" claim, in which Locus alleges that Global improperly billed Locus for calls delivered to Locus's switch, even if the calls were never completed to the party being called. Global contends that this counterclaim is flatly refuted by the terms of the Agreement, which, according to Global, provided that Global was entitled to bill Locus for such calls.

Similarly, Global seeks summary judgment on a claim concerning outbound calls to the United Kingdom ("UK"), in which Locus alleges that Global improperly billed it at wireless rates, which were higher than the rates applicable to landline calls. Global contends that this claim is defeated by the undisputed evidence showing that the calls in question did terminate at wireless phones in England. Global also advances other arguments relating to particular components of the claims at issue, which will be addressed below.

In its cross-motion, Locus contends that its counterclaims are not barred by Global's bankruptcy proceedings, because the counterclaims are based on a theory of

recoupment. Locus contends that both relevant case law and Global's bankruptcy plan itself permit the survival of claims sounding in recoupment against a party in bankruptcy.

In addition, Locus argues that Global, through its course of dealing with Locus, effectively modified the Agreement, by never seeking to enforce the dispute procedures that Global now claims Locus failed to follow. Locus contends that Global has, therefore, implicitly waived any claims or defenses it might have had based upon Locus's alleged failure to comply with the dispute procedures called for by the Agreement.

Locus further contends that: Global's own breaches of the Agreement preclude it from recovering on its breach of contract claim; none of the charges for which Global seeks recovery are valid; Global's claim for unjust enrichment is precluded by Global's claim for breach of contract; Global has failed to establish the elements of an account-stated claim; all of Global's claims for charges due on or before February 5, 2004 are time-barred under the FCA; Global's calculations of its alleged damages are erroneous; and the minimum monthly usage charges imposed by Global are unenforceable.

## DISCUSSION

### I. Effect of Global's Bankruptcy Proceedings

On January 28, 2002, Global's parent corporation, Global Crossing Ltd., and fifty-four of its subsidiaries, including Global, filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the Southern District of New York. An automatic stay of all claims against Global and the other debtors in that action took effect on that date pursuant to 11 U.S.C. § 362.

The debtors' Plan of Reorganization ("Plan") became effective on December 9, 2003. The Plan provided, in part, that upon its effective date, all entities holding claims against the debtors as of that date would be permanently enjoined from commencing or continuing any action or proceeding to collect any property from the debtors on account of such claims. Dkt. # 41–14 ¶ 9.5(a). The Plan further stated that "[i]n no event shall the [debtors, following their reorganization pursuant to the Plan] have any liability or obligation for any Claim against ... the Debtors arising prior to the Effective Date, other than the Assumed Liabilities." *Id.*

In addition, on December 13, 2002, the bankruptcy court issued an order ("cure order") authorizing the debtors to assume certain executory contracts, and fixing the "cure cost" with respect to each of those contracts, *i.e.*, the amount that had to be paid in order to cure any defaults under the contracts. The order provided that the cure costs listed in the order "are final and binding for all purposes and constitute a final determination of total cure required to be paid in connection with assumption of each such executory contract," and that they "shall not be subject to further dispute or audit...." Dkt. # 41–11 ¶¶ 5, 6. Global's Agreement with Locus was among the contracts listed in the cure order, and the stated cure "cost" of that contract was zero dollars. *Id.* at 8.[3]

---

**3.** As the Court of Appeals for the Second Circuit has recently explained,

> Section 365 of the Code ... provides that ... a trustee or chapter 11 debtor-in-possession may, with court approval, assume or reject any executory contract or unexpired lease of the debtor. Assumption is in effect a decision to continue performance. It requires the debtor to cure most defaults and continues the parties' rights to future performance under the contract or lease.

Prior to the entry of the cure order, notice of the proposed cure costs was sent to all interested parties, including Locus. The notice stated, *inter alia*, that "if you have a contract ... with the debtors, your contract ... may be subject to assumption and any cure costs associated with assumption fixed without further notice in accordance with the procedures described herein." Dkt. # 41 Ex. 10 ¶ 3 (emphasis omitted). The notice also stated that any objections to the proposed cure costs had to be filed no later than December 6, 2002, and that if no timely objections were received, "the Cure Costs shall be fixed in the amount listed...." *Id.* ¶ 6. Locus did not file any objections to the proposed zero-dollar cure cost with respect to its contract with Global.

Global contends that the cure order, the Plan, and Locus's failure to object to the Plan or cure order, or to seek some relief in Global's bankruptcy proceedings, render the issues before the Court in the case at bar simple and straightforward. According to Global, the cure order and the Plan bar both Locus's counterclaims and its defenses to Global's claims in this action. Global also asserts that the terms of the Agreement make clear that Global is entitled to collect the amounts that it seeks in this action. In response, Locus argues that its counterclaims are not barred by Global's bankruptcy proceedings because they are based on a theory of recoupment or setoff.

■ "While the Bankruptcy Code does not mention recoupment explicitly, bankruptcy law does recognize the recoupment doctrine." *In re McMahon*, 129 F.3d 93, 95–96 (2d Cir.1997). As the Supreme Court has explained:

It is well settled ... that a bankruptcy defendant can meet a plaintiff-debtor's claim with a counterclaim arising out of the same transaction, at least to the extent that the defendant merely seeks recoupment. Recoupment permits a determination of the just and proper liability on the main issue and involves no element of preference.

*Reiter v. Cooper,* 507 U.S. 258, 265 n. 2, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993) (internal citations and quotation marks omitted). *See also In re De Laurentiis Entertainment Group Inc.,* 963 F.2d 1269, 1276–77 (9th Cir.) (right of setoff survives even if claimant fails to file an objection prior to plan confirmation), *cert. denied,* 506 U.S. 918, 113 S.Ct. 330, 121 L.Ed.2d 249 (1992); *In re Davidovich,* 901 F.2d 1533, 1539 (10th Cir.1990) ("the right to assert a setoff against a mutual, prepetition debt owed the bankrupt estate survives even the Bankruptcy Court's discharge of the bankrupt's debts"); *In re A and C Elec. Co.,* 211 B.R. 268, 273 (Bankr. N.D.Ill.1997) ("The right of recoupment is unaffected by a discharge in bankruptcy") (citing *In re Flagstaff Realty Associates, Inc.,* 60 F.3d 1031, 1035–36 (3d Cir.1995)).

Though recognizing the recoupment doctrine, the Second Circuit has also characterized it as "a limited one [that] should be narrowly construed." *McMahon,* 129 F.3d at 97. In particular, the court has stated that for the recoupment doctrine to apply, "the claim and counterclaim must arise out of the same transaction or set of transactions." *In re Malinowski,* 156 F.3d 131, 133 (2d Cir.1998). That principle is in keeping with the rationale for the doctrine, which is that where a claim and counterclaim concern the same transaction, the

*In re Penn Traffic Co.,* 524 F.3d 373, 378 (2d Cir.2008) (citations and footnote omitted); *see also In re National Gypsum Co.,* 208 F.3d 498, 504–07 (5th Cir.) (explaining debtor's choice to reject or assume executory contract under § 1141(d) and effects of assumption), *cert. denied,* 531 U.S. 871, 121 S.Ct. 172, 148 L.Ed.2d 117 (2000).

court should strive "to do justice viewing [that] transaction as a whole." *Id.*

In *Westinghouse Credit Corp. v. D'Urso,* 278 F.3d 138 (2d Cir.2002), for example, the Court of Appeals held that "it would be inequitable ... to apply recoupment" to the facts before it, even though the case "concern[ed] a single integrated transaction, because the obligations to which [the respondent] wishes to apply recoupment arise from discrete and independent units within that transaction...." *Id.* at 146. The court made clear that it is not enough that a counterclaim arise out of the same transaction for the doctrine to apply; the circumstances must also be such that "it would be *inequitable* for the debtor to enjoy the benefits of that transaction without also meeting its obligations." *Id.* at 147 (quoting *Malinowski,* 156 F.3d at 133).

Applying these principles to the case at bar, I conclude that Counts II and III of Locus's counterclaim are barred by the Plan, but that Count I sounds in recoupment, and accordingly is not barred. Count II alleges that "Global Crossing's course of dealing with Locus ... constitute[s] unjust and unreasonable practices that are unlawful in violation of [the FCA]." Dkt. # 4 ¶ 73. That claim is not so directly related to the Agreement, *and* to the alleged breach of the Agreement as set forth in Global's complaint, for the recoupment doctrine to apply. The counterclaim may relate to the same contractual relationship as Global's claims against Locus, but the basis for liability asserted in these two counts of the counterclaim is separate from and independent of the parties' obligations under, or any breach of, the Agreement. Although the counterclaim alleges that Global's "failure to abide by the Agreement[ ]" in certain respects also constitutes a violation of the Act, Dkt. # 4 ¶ 73, the liability asserted in Count II

arises not from the Agreement itself, but from a federal statute.

Count II may be related to the Agreement, then, but—particularly in light of the Second Circuit's admonition that the recoupment doctrine is to be narrowly construed—I do not believe that the doctrine can properly be stretched to cover this claim. *See United States v. Hollis,* No. SA–08–CV–0362, 2008 WL 4179474, at *1 (W.D.Tex. Sept. 7, 2008) ("Assuming such [counter]claims arise out of the same transaction as the one sued upon, Hollis's [counter]claims do not sound in recoupment or offset," but were instead based upon alleged violations of federal and state statutes and regulations). As stated, the recoupment doctrine is based upon the idea that when faced with obligations arising out of a single integrated transaction, the court should seek to give effect to the mutual obligations arising out of that transaction. *D'Urso,* 278 F.3d at 147. Penalties or obligations arising out of a statute, independent of the transaction itself, are therefore outside the scope of that doctrine. *See Malinowski,* 156 F.3d at 133 ("since recoupment is an equitable, non-statutory exception to the automatic stay, it should be limited in bankruptcy to cases in which 'both debts ... arise out of a *single integrated transaction* so that it would be *inequitable* for the debtor to enjoy the benefits of that transaction without also meeting its obligations' ") (quoting *In re University Med. Ctr.,* 973 F.2d 1065, 1081 (3d Cir.1992)). Count II is therefore barred.

Count III of Locus's counterclaim asserts a claim for attorney's fees under the FCA. Section 206 of the Act provides that a common carrier who violates the Act is liable "for the full amount of damages sustained in consequence of any such violation ... together with a reasonable counsel or attorney's fee." 47 U.S.C. § 206.

Since Locus's substantive FCA claim is not cognizable in this action, however, its claim for attorney's fees under the Act is barred as well.

■ I reach a different result as to Count I of Locus's counterclaim, however. In Count I, Locus alleges that Global breached the Agreement in several ways, generally involving Global's imposition of certain charges that Locus contends were not justified, either factually or under the terms of the Agreement. For example, Locus alleges that it was improperly billed for certain calls to the UK, based on Global's use of the wrong numerical code for those calls. Locus also alleges that certain charges, or at least the amount of certain charges or the manner in which Global sought to collect them, contravened the express terms of the Agreement.

That claim arises directly out of the transactions that form the basis for Global's claims against Locus, and therefore the recoupment doctrine applies to this counterclaim. Resolution of Global's claims and of Count I of Locus's counterclaim would both require the factfinder to determine which, if any, charges at issue here were properly billed, and it would be difficult if not impossible to separate Global's claims from Locus's counterclaim.

Global contends that Count I should be dismissed in any event because it could only be used as a defense, in the form of a setoff, to Global's claims, rather than as a counterclaim asserting an independent claim for "recoupment" against Global. There is authority, however, "that 'both

set-offs and recoupments are to be pleaded as counterclaims rather than affirmative defenses.'" *Canadian St. Regis Band of Mohawk Indians ex rel. Francis v. New York,* 278 F.Supp.2d 313, 353 (N.D.N.Y. 2003) (quoting *Middletown Plaza Associates v. Dora Dale of Middletown, Inc.,* 621 F.Supp. 1163, 1165 (D.Conn.1985)). *See also* 3 James W. Moore et al., *Moore's Federal Practice* §§ 13.11, 13.31 (3d ed. 2008) (stating that "[r]ecoupment claims—the setting off against asserted liability of a counterclaim arising out of the same transaction as the initial claim—are by definition compulsory counterclaims," and that "[c]laims for setoff arise from a transaction separate from the subject matter of the opposing party's claim," and "are permissive counterclaims").[4] Furthermore, even if Locus had misdesignated its claim in this regard, that would have little impact here as a practical matter. *See Reiter,* 507 U.S. at 263, 113 S.Ct. 1213 ("it makes no difference that petitioners may have mistakenly designated their counterclaims as defenses, since Federal Rule of Civil Procedure 8(c) provides that 'the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation'").

■ For the same reason, I also reject Global's argument that the counterclaim asserted in Count I is barred by the doctrine of *res judicata.* In general, "the confirmation of a Chapter 11 plan operates to discharge the debtor of debts incurred prior to confirmation." *In re Layo,* 460

---

**4.** Although *Moore's Federal Practice* describes claims for recoupment and setoff as compulsory and permissive counterclaims, respectively, there is under the current rules of pleading no significant difference between counterclaims sounding in "recoupment" and in "setoff." *See Westinghouse Credit Corp.,* 278 F.3d at 145 n. 2 (observing that "the distinction between a recoupment and a setoff

retains little significance under the modern rules for asserting counterclaims in pleading") (internal quotation marks omitted); *see also ITV Direct, Inc. v. Healthy Solutions, LLC,* 445 F.3d 66, 72 (1st Cir.2006) ("To modern ears, the distinctions between recoupment, setoff and modern statutory variations are hoary and largely arbitrary").

F.3d 289, 294 (2d Cir.2006) (internal quotation marks omitted). *See also In re Flushing Hosp. and Med. Center,* 395 B.R. 229, 244 (Bankr.E.D.N.Y.2008) ("Confirmation orders are given *res judicata* effect, and may not be subject to collateral attack"); *In re Cross Media Marketing Corp.,* 367 B.R. 435, 447 (Bankr.S.D.N.Y. 2007) ("It is well settled that a bankruptcy court's order confirming a chapter 11 plan is treated as a final judgment on the merits with full *res judicata* effect").

That rule only applies, however, to claims that were not preserved by the plan itself. *See In re I. Appel Corp.,* 300 B.R. 564, 567 (S.D.N.Y.2003) ("the confirmation of a plan of reorganization prevents the subsequent assertion of any claim not preserved in the plan"), *aff'd,* 104 Fed.Appx. 199 (2d Cir.2004); *In re BOUSA Inc.,* No. 89–B–13380, 2006 WL 2864964, at *5 (Bankr.S.D.N.Y. Sept. 29, 2006) ("The Second Circuit typically affords confirmation of a plan res judicata effect, preventing the assertion of claims not preserved in the plan") (citing *Silverman v. Tracar, S.A.,* 255 F.3d 87, 92 (2d Cir.2001)).

■ The Plan here does expressly provide for some recoupment rights: it enjoins entities with claims against the debtors from asserting any right of setoff, "except for recoupment" against any obligation due to the debtors. Dkt. # 41 Ex. 12 ¶ 9.5(a). Count I of the counterclaim is therefore not barred by *res judicata.*

## II. Locus's Alleged Failure to Comply with the Dispute Procedures

■ Global contends that under the Agreement, Locus was permitted to withhold payment of an invoice only if the invoice was disputed within thirty days of its receipt from Global. With respect to the invoices at issue in this case, Global further contends that Locus withheld payment notwithstanding its failure to file a dispute within the thirty-day period. Having failed to file a timely dispute, Global contends, Locus lost any right it may have had to withhold payment, and Global's invoices are therefore binding on Locus. In response, Locus contends that Global unilaterally modified the Agreement with respect to the dispute procedures, by not insisting upon compliance with, or in any way attempting to enforce, the provisions setting forth those procedures.

In support of its position, Global cites *Frontier Communications of the West, Inc. v. North American Long Distance Corp.,* No. 99–CV–0868, 2001 WL 1397856 (W.D.N.Y. Oct. 24, 2001). That case involved a dispute between a telecommunications provider ("Frontier") and another telecommunications company ("NALD Canada"), who had entered into a contract similar to that between Global and Locus.[5]

The court in *Frontier* granted summary judgment for Frontier on its contract claim against NALD Canada, in part based on NALD Canada's breach of the dispute provisions in the parties' agreement. In so ruling, the court stated:

> even assuming that NALD Canada had properly disputed each and every unpaid invoice, according to the terms of the Agreement plaintiff is still entitled to summary judgment. Pursuant to the clear and explicit terms of the Agreement, NALD Canada was required to pay the invoices—including the disputed portions—in full and then dispute them in writing, with supporting documentation, within sixty days. It is undisputed that NALD Canada did not pay the

---

**5.** Global is the corporate successor to Frontier. *See* Dkt. # 42 at 19 n. 7; *Excelsior Fund, Inc. v. JP Morgan Chase Bank, N.A.,* No.

06 Civ. 5246, 2007 WL 950134, at *1 (S.D.N.Y. Mar. 28, 2007).

disputed invoices—as it was required to do and as it had agreed to do pursuant to paragraph 4 of the Agreement—; accordingly NALD Canada breached the Agreement. Furthermore, because the Agreement required NALD Canada to pay the invoices timely and in full and then dispute any contested charges in writing, with supporting documentation, within 60 days of the invoice date and because this time frame has long since expired, NALD Canada has lost its right to avail itself of the dispute resolution mechanism provided for in the Agreement. Accordingly, summary judgment will be entered in favor of Frontier against NALD Canada.

2001 WL 1397856, at *4. Global argues that the same reasoning applies to the case at bar.

The contractual provisions concerning the dispute procedure in the case at bar are similar, but not identical, to those in *Frontier.* In *Frontier*, the parties' agreement provided in part that NALD Canada "ha[d] the affirmative obligation of providing written notice and supporting documentation for any good-faith dispute with an invoice ('Dispute') within 60 Business Days after [its] receipt" of the invoice, and that if NALD Canada "d[id] not report a Dispute within the 60 Business Day period, [NALD Canada would be deemed to] have irrevocably waived its dispute rights for that invoice." The agreement further provided that NALD Canada would "pay disputed amounts, subject to resolution of the Dispute." *Id.* at *1 n. 4.

In the case at bar, § 4 of the Agreement provides that Locus "shall have the affirmative obligation of providing written notice of any dispute with an invoice within 90 days after receipt of the invoice by

Locus," and that "Locus may withhold payment only on amounts so disputed within 30 Business Days after Locus's receipt of the Invoice. Locus may not withhold payment of amounts disputed after such 30 Business Day period." Dkt. # 41–3 at 8. The Agreement also states that "[i]f Locus does not report a dispute with respect to an invoice within the 90 day period, Locus is deemed to have irrevocably waived its dispute rights for that Invoice and to have agreed to pay the same." *Id.*

In addition, § 3.5 of the Agreement states that "[a]ny Invoice not properly disputed under Section 4 hereof and not paid by the Due Date shall bear late payment fees at the rate of 1–1/2% per month...." *Id.* at 6. That section further provides that Global may immediately suspend its services to Locus "if any invoice not properly disputed under Section 4 hereof is not paid" within thirty days after the date of the invoice. *Id.*

Locus contends, however, that Global has never rejected or denied any of Locus's disputes based on Locus's failure to follow proper dispute procedures. Locus asserts that Global thereby unilaterally modified the Agreement, to dispense with at least some of the procedural dispute requirements set forth in the Agreement, and that Locus relied on that modification when it disputed various charges. Locus argues that Global is therefore precluded from now seeking to enforce strict compliance with the written dispute procedures.

There is authority in New York that "[m]odifications of written contracts may be proved circumstantially by the conduct of the parties subsequent to the agreement." *Chase v. Skoy*, 146 A.D.2d 563, 564, 536 N.Y.S.2d 512 (2d Dep't 1989).[6]

---

**6.** The Agreement provides at § 16 that it "will be construed and enforced in accordance with the law of the state where Locus's ac-

count is supported, as designated by Global Crossing in this Agreement or as designated in Exhibits or amendments to this Agreement,

*See also Allied Chem. Corp. v. Alpha Portland Indus., Inc.*, 58 A.D.2d 975, 976, 397 N.Y.S.2d 480 (4th Dep't 1977) ("Defendant may ... rely upon extrinsic evidence to establish that the parties have modified the agreement"). "[T]he parties' conduct plays a central role in contract formation and, by extension, contract modification." *Deutsche Asset Mgmt., Inc. v. Callaghan,* No. 01 Civ. 4426, 2004 WL 758303, at *16 (S.D.N.Y. Apr. 7, 2004).

"The guiding principle behind all of these inquiries into contract formation [or modification] is that they are for the factfinder." *Deutsche Asset Mgmt.*, 2004 WL 758303, at *16 (material issues of fact, concerning whether parties expressly or impliedly modified their agreement, rendered summary judgment inappropriate). *See, e.g., Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 559 n. 12 (2d Cir.2000) (stating that whether parties' prior conduct modified terms of contract presented "a factual issue to be explored by the District Court on remand"); *Chase,* 146 A.D.2d at 564, 536 N.Y.S.2d 512 ("the conflicting statements made by the parties in their affidavits [concerning whether parties intended to modify agreement] clearly give rise to issues of fact which preclude summary judgment"); *Allied Chem.*, 58 A.D.2d at 976, 397 N.Y.S.2d 480 ("defendant has raised questions of fact sufficient to defeat plaintiff's motion for summary judgment. Accordingly, the trial court will be obliged to examine the conduct of the parties under the agreement to determine whether the contract has been modified").

In the case at bar, Global contends that it *"has* rejected disputes submitted by Locus on the grounds that Locus did not follow the proper dispute procedure," Dkt.

# 66 at 5, but the evidence before me certainly does not establish that as a matter of law. The only example given by Global relates to a dispute submitted by Locus in June 2005, in the amount of $27,354.09, based on an alleged "inbound minute discrepancy." *See* Dkt. # 66–7. The evidence concerning that dispute, however, does not show that Global rejected that dispute on procedural grounds.

In a letter to Karilyn Castro at Locus dated June 7, 2005, Global Customer Support Manager Jeff Costa stated that Global was "declining [the] dispute, as there [wa]s insufficient supporting documentation and contractual language to support any credit." *Id.* at 3. He said nothing about any failure to follow proper dispute procedures.

In an email to Castro that same day, Costa referred her to "the attached denial letter which provides notification as to reason Global Crossing has taken this action." *Id.* at 2. Costa added that if Locus had "any supporting documentation that ha[d] not been received by Global Crossing," Locus should submit it to Global "within the next 10 business days," and that the "dispute w[ould] be closed after that time has elapsed if no ... valid reason exists to warrant further investigation." *Id.* A month later, Costa sent another email to Castro stating that "this dispute is now closed" and that Locus had not "received any supporting documentation to warrant any further investigation of this dispute." *Id.*

I fail to see how this evidence supports Global's assertion that it rejected the June 2005 dispute because "Locus failed to comply with the agreed-upon dispute procedure." Global's Supplemental Brief (Dkt.

without regard to that state's choice of law principles." Dkt. # 41–3 at 12. Amendment # 4 to the Agreement, which became effective

on December 5, 2002, provided that the Agreement would be governed by New York law. Dkt. # 1–2 at 26.

# 66) at 5. Clearly, Global rejected the dispute because, in its view, Locus had failed to submit sufficient *proof* to establish its entitlement to a credit. If Locus did fail in some way to follow the prescribed procedures, then this evidence shows that Global overlooked that noncompliance, and considered the merits of Locus's dispute, notwithstanding any procedural irregularities or defects on Locus's part.

Locus also contends that Global routinely failed to insist upon strict adherence to the letter of the Agreement with respect to dispute procedures and other matters. In that regard, there is evidence in the record that on several occasions, Global waived late-payment charges against Locus, including charges on payments that Locus had withheld because the underlying charges were in dispute. *See* Dkt. # 48 Ex. J. In part, Global waived those late-payment charges because Locus was considered "a top 20 account." *Id.*

Although some of this evidence does support Locus's allegations concerning contract modification, the evidence is not so one-sided as to establish as a matter of law that the parties' course of conduct effectively modified the Agreement. For one thing, as Global notes, § 11 of the Agreement provides that "[n]o failure or delay by either Party in exercising any right, power or remedy will operate as a waiver of any such right, power or remedy," and that "[t]he waiver by either Party of any of the covenants, conditions or agreements to be performed by the other or any breach thereof shall not operate or be construed as a waiver of any subsequent breach of any such covenant, condition or agreement." That tends to undercut, though it does not necessarily disprove, Locus's contention that the parties simply disregarded the written dispute procedures entirely.

On each party's motion for summary judgment, the Court must construe the evidence in the light most favorable to the party opposing the motion, and draw all reasonable inferences in that party's favor. *Tidewater Inc. v. United States,* 565 F.3d 299, 302 (5th Cir.2009); *White River Amusement Pub, Inc. v. Town of Hartford,* 481 F.3d 163, 167 (2d Cir.2007). Applying that rule here, I conclude that there are issues of fact concerning whether the Agreement was modified with respect to the dispute procedures. If in fact it was the parties' practice and understanding that Locus would be permitted to withhold payment of amounts in dispute, without penalty, and without regard to whether Locus had followed the contractual dispute procedures, then a factfinder might reasonably be able to conclude that the Agreement was modified in that regard.

In addition, although the Agreement provided that Locus would be deemed to have "irrevocably waived its dispute rights" as to any invoice that it did not dispute within ninety days, "and to have agreed to pay" such invoice, the Agreement did not state what the effect would be of Locus's failure to comply with other aspects of the dispute procedures. It did not state, for example, what would happen if Locus withheld payment of an amount that it disputed more than thirty, but less than ninety, business days after receipt of the relevant invoice. Since the Agreement is silent on that issue, the parties' intent and understanding in that regard also presents an issue of fact.

This result finds support in an unreported decision of this Court in another case that has been addressed by both the parties here, *Global Crossing Bandwidth, Inc. v. Centrix Telecom, L.L.C. ("Centrix").* In that case, Global sought summary judgment on its claim for over $4 million in damages from the defendant, Centrix, aris-

ing out of Centrix's alleged breach of a telecommunications contract. The agreement in *Centrix* provided that Centrix was required to file a written objection to any disputed charge within ninety days from Centrix's receipt of the invoice in question, and that if Centrix failed to do so, it would be deemed to have waived its right to dispute the invoice. The contract also provided that Centrix was not permitted to withhold the disputed amount pending resolution of its objection, and that the contract could not be modified other than in writing.

Centrix alleged that it disputed a number of invoices, and that when it did so, Global informed Centrix not to file any written disputes, but to contact Global's account representatives directly, for a quicker, informal resolution of the dispute. Based on Centrix's allegations, United States District Judge Michael A. Telesca held that "a material question of fact [wa]s presented as to whether the billing correction procedure authorized by Global Crossing's account representatives became a modification of the contract which was relied upon by Centrix." 03–CV–6665, Dkt. # 57 at 4–5 (Dec. 8, 2005) (citing *John Street Leasehold LLC v. FDIC*, 196 F.3d 379, 382 (2d Cir.1999)). Judge Telesca therefore denied Global's motion for summary judgment.

The same reasoning applies here. Locus contends that Global consistently failed to follow, or insist upon compliance with, the dispute procedures set forth in the Agreement, and that Global routinely waived late-payment charges for amounts that Locus withheld during a dispute. Based on that evidence, a factfinder might well conclude that Global induced Locus to believe that it was not required to follow the prescribed grievance procedures to the letter, and that the parties thus effectively modified the Agreement. Since that pres-

ents an issue of fact, summary judgment is inappropriate with respect to Global's assertion that Locus is barred from contesting the validity of Global's invoices because of Locus's failure to follow the dispute procedures.

### III. "Partial" Summary Judgment with Respect to Locus's Counterclaims under Rule 56(d)

In addition to the issues concerning Locus's compliance with the contractual dispute procedures, there are also issues in this case concerning the merits of Locus's counterclaims, relating to whether certain charges imposed by Global were valid. Global contends that even if Locus did comply with the applicable dispute procedures (or if Locus's noncompliance is found not to bar its counterclaims), Global is still entitled to summary judgment dismissing Locus's counterclaims on the merits.

Having found that there are issues of fact with respect to the dispute-procedure issue, the Court could simply deny both parties' motions for summary judgment and leave it at that, with that procedural issue going to trial. If, however, Locus's counterclaims are substantively meritless, it would be a waste of time and effort to try that procedural issue, since the counterclaims would ultimately fail, regardless of whether Locus had followed the correct dispute procedures.

On the other hand, if the undisputed facts demonstrate that—leaving the procedural issue aside—Locus is correct that some of Global's charges were invalid as a matter of law, then it makes sense to address that contention now, with the matters having been fully briefed and ripe for adjudication. Such a ruling now could help narrow the issues for trial, and avoid unnecessary or redundant proceedings later.

The Federal Rules of Civil Procedure expressly provide for such a ruling. Rule 56(d)(1) states that

> [i]f summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue. The court should so determine by examining the pleadings and evidence before it and by interrogating the attorneys. It should then issue an order specifying what facts—including items of damages or other relief—are not genuinely at issue. The facts so specified must be treated as established in the action.

In addition, Rule 56(d)(2) provides that "[a]n interlocutory summary judgment may be rendered on liability alone, even if there is a genuine issue on the amount of damages."

■ Although Rule 56(d)(1) speaks in terms of determining what facts "are not genuinely at issue," that does not mean that the parties themselves have to expressly *agree* on those facts, any more than they have to agree on what material facts are undisputed on a motion for summary judgment under Rule 56(c). The standards under both parts of the rule are the same. *See Doyle v. Huntress, Inc.,* 301 F.Supp.2d 135, 141 (D.R.I.2004) ("motions for partial summary judgment under Rule 56(d) are subject to the same standard of review as their counterparts under Rule 56(c)"); *Melvin v. Patterson,* 965 F.Supp. 1212, 1214 (S.D.Ind.1997) ("In making a partial summary judgment ruling [under Rule 56(d) ], courts employ the normal standard for summary judgment under Rule 56(c)"); *see also* 11 James W. Moore et al., *Moore's Federal Practice,* § 56.40[2] (3d ed. 2008) ("Courts employ the normal summary judgment standard in making partial summary judgment rulings resolving a claim or establishing facts").

As indicated, if the Court is able to rule now on the merits of the parties' claims concerning the propriety of Global's charges, then I believe it would be advisable to do so, even though factual issues concerning the dispute procedures might preclude the Court from entering summary judgment on any of those claims in their entirety. Depending on the Court's rulings, such "partial" summary judgment might render it unnecessary to try those remaining issues at all, or at the very least, might take certain issues out of the case, so that the eventual trial could be conducted more efficiently, with the focus on those areas that remain genuinely in dispute. *See* 11 James W. Moore et al., *Moore's Federal Practice,* § 56.40[2] (3d ed. 2008) ("In availing itself of the ability granted by Rule 56 to issue orders which resolve significant questions, a court can focus the litigation on the true matters in controversy"); *see, e.g., Dexia Credit Local v. Rogan,* No. 02 C 8288, 2009 WL 855638, at *1 (N.D.Ill. Mar. 30, 2009) ("The Court agrees with Dexia that it is appropriate to make findings under Rule 56(d)(1) identifying the facts that are not genuinely at issue, to simplify the issues and evidence at trial"); *Priyanto v. M/S Amsterdam,* No. CV 07–3811, 2009 WL 650734, at *1 (C.D.Cal. Mar. 11, 2009) ("the Court is not limited to disposing of entire claims on a summary judgment motions," since " 'one of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses' ") (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

## IV. Disputed Charges

■ The disputed charges here can be broken down into two broad categories: charges for inbound minutes ("inbound-minutes charges"), and charges for certain outbound calls to the UK ("UK charges").

These claims will be addressed in turn. Since it is Locus that is contesting the validity of these charges, the charges will be discussed primarily in the context of Locus's counterclaims.

## A. Inbound–Minutes Charges

Locus alleges that Global billed it for an excessive number of minutes for certain inbound calls. In its counterclaim concerning these charges, Locus alleges that Global "charged Locus for all calls delivered to Locus' switch whether they became 'completed' calls or not," and that Locus eventually "determined that it was being invoiced for at least six percent (6%) more call records than were delivered to Locus' switch." Dkt. # 4 ¶¶ 16, 17.

The parties seem to agree that minutes for these calls were billed according to a certain formula, involving the difference between a "request for service event" and a "call disconnect event." *See* Complaint Ex. B; Sam Lee Aff. (Dkt. # 48–2) ¶ 62. Locus contends, however, that this formula was misapplied by Global, with the result that Locus ended up being billed for more minutes than it should have been.

Global responds that this counterclaim is flatly barred by the terms of the Agreement itself. Specifically, Global notes a provision in the Agreement by which "Locus acknowledge[d] and agree[d] that call records detail (CDR) [sic] for Toll–Free Carrier Transport it receives from Global Crossing may not match billable CDR's from Locus' switch as Global Crossing bills Locus for all calls completed to their switch . . ., (regardless of whether the call is completed to the called party)." Dkt. # 41 Ex. 2 at 4, ¶ 4.

Locus does not deny that it agreed to this provision, but contends that this provision is irrelevant to the dispute over inbound minutes. Locus states that it is not alleging that Global improperly billed *un-*completed calls, but that Global improperly continued to assess charges for completed calls after the calls were terminated and disconnected.

That does not appear to be the position that Locus took prior to the termination of the Agreement, however. In an email to Global on November 16, 2005, Gomez stated that "[t]he Inbound disputes relates [sic] to significant difference in *total calls rather than minutes.* We have documentation available to show that *calls never reached our switch,"* in other words, that the calls never should have been billed in the first place. Dkt. # 48–3.

Gomez's statement in that regard is consistent with the dispute forms that Locus submitted to Global. In an email to Global dated January 22, 2004, Estee Choi of Locus stated, "Please find attached dispute for (certain time periods). It's Inbound-minute discrepancies." Dkt. # 41 Ex. 6. That dispute (which was rejected by Global on the ground that there was "insufficient supporting documentation and contractual language to support any credit," *id.* at 17), was accompanied by records indicating that there was a discrepancy between the charges invoiced by Global and what charges were warranted according to Locus's records. The records for the period December 7, 2003 through January 6, 2004, for example, indicated that Global had invoiced $518,914.32 in toll-free domestic calls (which appear to be the primary, if not sole focus of this claim), based on 42,398,801.36 minutes of usage. *Id.* at 9. Locus's records reflected its belief that the totals should have been $504,006.20 and 42,057,538.2 respectively. *Id.*

That document also shows, however, that the invoiced charges and minutes were also attributable to 6,207,493 telephone *calls,* whereas Locus's records indi-

cated that only 5,961,972 billable calls were made during that period. *Id.* Under the heading, "Difference," the form submitted by Locus indicated that Global's invoices exceeded what was shown in Locus's records by 351,497.46 minutes, 248,583 calls, and $16,217.93 in total charges for the period in question. *Id.*[7]

It appears, then, that when Locus disputed the inbound-minutes charges, it asserted that Global had charged it for *too many* calls, not that the calls that *were* made were billed for an excessive number of minutes. Again to use the time period discussed above as an example, dividing the number of minutes that Locus claimed should have been billed (42,057,538.2) by the number of calls that Locus claimed was correct (5,961,972) yields an average of just over 7 minutes per call. Carrying out the same computation using the differential between Global's and Locus's figures (*i.e.*, 351,497.46 minutes divided by 248,583 calls) results in an average of about 1.4 minutes per call. In other words, if the "excess" calls were billed, on average, for just 1.4 minutes each, that alone would account for all of the "excess" minutes. Those numbers do not suggest that there must have been some other reason for the number of minutes invoiced by Global, such as individual calls being charged for more minutes than they should have been.[8]

Locus's assertion now, in this litigation, that this dispute is really about Global continuing to bill minutes for calls after the calls had been terminated appears to be a *post hoc* attempt to avoid the clear language of the Agreement, which flatly bars Locus from disputing charges for calls on the ground that Locus had no record of those calls having been made. I conclude, therefore, that Global is entitled to summary judgment on this counterclaim.

## B. UK Charges

Count I of Locus's counterclaim also alleges that Global "levied inflated rates for land-line calls to the United Kingdom ('UK')." Dkt. # 4 ¶ 20. According to Locus, Global's invoices indicated that Global was applying wireless termination rates (which were much higher than landline rates) to landline calls to the UK. Locus claims that this was due to Global's use of the wrong dialing code for such calls.

In response, and in support of its claim for recovery of the amount of these charges, Global contends that Locus has already admitted that these calls (which are sometimes referred to as "4407 calls," based on the dialing code that was used for the calls) terminated at wireless (*i.e.*, cellular) phones in the UK.[9] Global notes that when asked in an interrogatory from Global, "Do you contend that calls completed using the 44-07 dialing code did not terminate to a cellular phone?," Locus answered, "No."

Locus does not appear to dispute that these calls did terminate to wireless telephones, but Locus contends that they should never have been completed in the

---

7. A relatively minuscule amount of Global's charges (about $1300) was for toll-free off-shore and directory-assistance calls. It appears that Locus had no record of such calls being made.

8. To carry the point further, if this calculation had yielded a figure of, say, 60 minutes per "excess" call, one might suspect that not only was Global billing Locus for more *calls* than

it should have been (at least according to Locus's records), but that too many *minutes* were being charged per call, including the calls that Locus agreed had been made.

9. For purposes of this Decision and Order, the terms "wireless" and "cellular" are considered to be synonymous and are used interchangeably.

first place. Locus asserts that the fact that these calls did terminate at wireless phones was entirely due to Global's configuration of its network, and that Global never gave Locus any advance notice either that its system had been so configured, or that these calls would be billed at wireless rates.

The evidence indicates that this dispute stemmed from customers' entering the code "4407" when calling the UK. The first two digits represent the UK's country code, 44. In other words, if a caller entered "44" at the correct point in the numerical calling sequence, the call would be directed to the UK.

For calls to the UK, Global had designated "7" as a destination code for cellular telephones. *See* Dkt. # 67 at 3. That means that if a person calling the UK entered the sequence "447" at a certain point, the call would be directed to a cellular telephone in the UK.

Global's list of country and destination codes said nothing about the sequence "07" for calls to the UK. Apparently, however, Global had configured its system in such a way that if the caller entered the sequence "4407," the call would automatically be routed to a wireless phone in the UK. *See* Kim Aff. (Dkt. # 98–5) ¶ 16.

In early January 2004, Locus received its invoice from Global for the monthly billing cycle ending on January 6, 2004. Locus states that by January 19, 2004, it had discovered that its charges for calls to the UK had gone from about $34,000 for the previous month's billing cycle to nearly $300,000, an increase of over 800%.

Shortly thereafter, Locus learned that at least some of that spike was due to 4407 calls being billed at wireless rates. Apparently Locus learned this from an examination of the call detail records that were provided to Locus each month by Global.

Global confirmed that the calls were being billed as cellular in an email to Locus on February 10, 2004.

In an email to Global dated February 12, 2004, Dillon Kim of Locus, referring to a list of country and destination codes that Global had previously provided to Locus, contended that the listings were confusing or misleading as to which codes were mobile-phone codes. Kim stated that with respect to Italy, for example, the country code was listed as 39, and "calls 03 and 3 as mobile. . . ." Kim pointed out, however, that "many other destinations, including UK, does not [sic] include both 0x & x as mobile." Dkt. # 48–5 at 10. Kim stated that Locus should not be forced to "make assumptions as to what should or shouldn't be included" in the mobile-phone codes. *Id.*

Global denied Locus's dispute regarding this issue. In an email to Kim dated March 11, 2004, Global's Carol Doll stated that Global's "investigation has confirmed that this [4407] dialing sequence ultimately terminated to cellular numbers, therefore, the calls were correctly rated based on the intended designation." Dkt. # 48–5 at 16. Doll also stated, however, that although Global had concluded that these calls were properly billed at wireless rates, "[t]he dialing sequence of 44–0 is not a format to be used when originating outside the UK. Going forward, Global Crossing will be making a provision on our Network to block these calls, in support of our Carrier Customers." *Id.*

In a followup email to Kim dated May 14, 2004, Doll stated, "Given that 44 07 is an invalid dialing sequence, Global Crossing has taken the necessary steps to block this dialing pattern in its network going forward. Further, we have updated our Dial Plan Code list to include the codes in the event the invalid sequence is used and

calls are terminated to mobile numbers." Dkt. # 48–5 at 19.

There is also evidence in the record concerning some internal discussions within Global about this matter. In an email to several other Global employees dated February 20, 2004, Raymond Brzezinski of Global stated that: "[t]he dialing sequence of 44–0 is used ... for calls that are originating in the UK and terminating to a destination in the UK"; it was "standard practice" for callers to "drop the zero" when making calls to the UK from outside the UK; and "[c]alls that originate outside of the UK and are meant to terminate to the UK that are delivered with 44–0 are being delivered in an invalid format and should not complete." Dkt. # 48–2 at 20.

Brzezinski also stated that at some point, Global's switches had been programmed to automatically convert the "440" sequence to "44," so that when a caller entered "4407," that sequence would automatically be converted to "447," with the result that the call would be delivered to a cellular telephone in the UK. Brzezinski said that such calls were correctly "rated as cellular ... based on the intended destination," but that Global had nevertheless asked its routing teams to block all international calls to the UK that were "delivered in the 44–0 format." He added that "[w]e are working with contracts to see if we have legal coverage in the contract to support the fact that the customers are delivering the digits in an invalid format, hopefully we are covered because morally we are correct," and that "[a]t this point we are leaning towards the denial of all credits related to these disputed [sic] because we are handling the calls correctly despite the fact that the customer is sending an invalid format." Dkt. # 48–2 at 20.

Based on the undisputed facts before me, I conclude that these charges were improper. First, with respect to Global's

argument that "Locus *admitted* that all 44–07 calls terminated at wireless phones in England," Dkt. # 54 at 15 (emphasis in original), that is beside the point. Locus's counterclaim does not appear to be based on *whether* these calls terminated at a wireless phone in the UK, but on *why* they did so. Locus alleges that it was only because of Global's configuration of its system that 4407 calls were routed to cellular phones in the UK, and that Global failed to disclose that fact to Locus until after Locus had been invoiced for, and disputed the charges for those calls.

Admittedly, there does appear to be some inconsistency or confusion in the record about whether Locus has alleged that the 4407 calls terminated at wireless, or wireline (*i.e.* "conventional") telephones. Locus's counterclaim alleges that Global "was assessing wireless termination rates to landline calls" to the UK, Dkt. # 4 ¶ 21. In addition, Dillon Kim from Locus has stated in an affidavit dated April 2, 2007 that the 4407 code "applies to calls completed to cellular or wireless phones in the UK," and that Global overcharged Locus by "applying the wrong '44–07' code to the wireline calls to the UK. . . ." Dkt. # 48–5 ¶¶ 16, 18. In its August 2006 answers to Global's interrogatories, however, Locus responded, "No," when asked whether it "contend[ed] that calls completed using the 44–07 dialing code did not terminate to a cellular phone[.]" Dkt. # 41 at 8.

Any inconsistency in this regard is minor and immaterial, however, and I disagree with Global's assertion that Locus is attempting to "change[ ] its tune" concerning this matter. Throughout this litigation, it has been Locus's contention that Global wrongly charged Locus wireless rates for 4407 calls, because of Global's configuration or "manipulation" of its internal system, and that Locus was unaware that this had occurred until it re-

ceived invoices from Global for vastly higher charges for calls to the UK than Locus had expected.

Although at times in this case Locus may have framed this issue in terms of applying wireless rates to landline calls, the bottom line has always been that, according to Locus: (1) Global improperly charged Locus for calls to the UK that were made using the 4407 code; (2) this was due to Global's configuration of its system; and (3) Global failed to give Locus any advance notice of how such calls would be handled or billed. Discovery may have clarified precisely what occurred, and sharpened Locus's position accordingly, but those basic contentions have always been the crux of this dispute.

As stated, I also find as a matter of law that the UK charges were not valid, based on the undisputed facts before me. As Dillon Kim's February 12, 2004 email to Global pointed out, Global had provided Locus with a list of country and destination codes effective January 30, 2004. With respect to Italy, for which the country code is 39, destination codes "3" and "03" were both listed under the column "Destination Name" as "Italy (Cellular)." Dkt. # 67 at 3. Other similar pairs of destination codes were assigned to various destinations; for example, "2" and "02" were both listed as "Italy—Milan," "21" and "021" were listed as "Luxembourg (Cellular)," and so on.

For the UK, "207" and "208" were both listed under the destination "London." The code "7" was listed as "United Kingdom (Cellular)." There was no listing for destination code "07." Thus, there was no explicit indication that "07" calls would be treated as wireless calls to the UK, and in fact the other listings suggested that "07" was simply not a valid code at all. By indicating, for example, that "3" and "03" were both valid destination codes for calls to cellular phones in Italy, Global's listing of only one code—"7"—for wireless UK calls implied that there was no corresponding "07" code for such calls.

Global also seems to have recognized that "4407" was not a valid sequence, and that calls made using that sequence should not have gone through. Doll stated in her March 11, 2004 email to Kim that "[t]he dialing sequence of 44–0 is not a format to be used when originating outside the UK," and that "[g]oing forward, Global Crossing will be making a provision on our Network to block these calls, in support of our Carrier Customers." Three days later, she again stated in another email to Kim that "44 07 is an invalid dialing sequence," and that Global had therefore "taken the necessary steps to block this dialing pattern in its network going forward," and "updated [its] Dial Plan Code list to include the codes in the event the invalid sequence is used and calls are terminated to mobile numbers."

Similarly, in his internal Global email dated February 20, 2004, Brzezinski stated that "[c]alls that originate outside of the UK and are meant to terminate to the UK that are delivered with 44–0 are being delivered in an invalid format and should not complete." He explicitly recognized that this was due not to any conduct on Locus's part, but to Global's programming of its own switches. Although Brzezinski opined that Global was "morally ... correct" and that Global was "handling the calls correctly" (apparently based on the premise that Global was effectuating the callers' intent to call wireless phones in the UK), he too noted that, going forward, Global was nevertheless going to block all calls to the UK containing the "4407" se-

quence.[10]

The record establishes, then, that these charges should not have been imposed. They were generated by callers' use of a numerical sequence that, by Global's admission, was invalid, and the fact that they were completed to wireless phones in the UK is attributable to Global's own configuration of its switches, apparently based on its unilateral decision about effectuating the callers' intent. Moreover, Global did not inform Locus in advance that such calls were going to be treated in that manner, and in fact the information that Global had given to Locus was positively misleading with respect to the 4407 code.

As stated, however, my finding on this matter does not entitle Locus to summary judgment. Factual issues remain to be decided regarding whether Locus has waived its right to contest these charges by not following the prescribed dispute procedures,

## C. Minimum Monthly Usage Charges

Locus contends that the roughly $192,000 in minimum monthly usage charges ("MMUCs") imposed by Global are an invalid penalty and unenforceable as a matter of law. In support of that assertion, Locus relies on the arguments made by the defendants in another case brought by Global in this Court, *Global Crossing Bandwith, Inc. v. OLS, Inc.*, 05–

CV–6423. The defendants in OLS, who were represented by the same counsel as Locus in the case at bar, contended that the MMUCs were unenforceable under both New York and federal law.

On July 8, 2008, however, this Court issued a Decision and Order in *OLS* finding that "the MMUCs are not a penalty, and that the contractual clauses providing for the MMUCs are enforceable." 566 F.Supp.2d 196, 203 (W.D.N.Y.2008). In addition, on March 19, 2009, I issued a Decision and Order (Dkt. # 107) in *OLS* that, *inter alia,* denied the defendants' motion for a stay of the action pending a decision by the Federal Communications Commission on whether Global's MMUCs constituted "unreasonable and unjust charges" in violation of the FCA. 2009 WL 763483, at *1.

For the reasons stated in those two decisions, I likewise deny Locus's motion for summary judgment in the case at bar insofar as it seeks either a declaration from this Court or other relief striking down Global's MMUCs on the ground that they are invalid as a matter of law.

That does not necessarily mean, however, that Global is entitled to collect those charges. As explained below, whether there is a legitimate factual basis for the MMUCs depends at least in part on when, and by whom, the Agreement was formally

---

**10.** Arguably, Global's subsequent blocking of such calls could be viewed as a subsequent remedial measure and hence inadmissible to show Global's culpable conduct; *see* F.R.E. 407; *see, e.g., R.M. Perlman, Inc. v. New York Coat, Suit, Dresses, Rainwear & Allied Workers' Union Local 89–22–1*, 33 F.3d 145, 156 (2d Cir.1994) (union's letter to its locals recommending that certain clause in model jobber's agreement be reworded or removed constituted subsequent remedial measure, and "[a]s such, it [wa]s not probative of the [union]'s intent to apply the ... Clause in an unlawful manner") (citing F.R.E. 407).

Global has not objected to this evidence on that ground, however. *See Lust v. Sealy, Inc.,* 383 F.3d 580, 585 (7th Cir.2004) ("Sealy has not invoked Rule 407 and any objection to the evidence based on that rule is therefore waived"). In addition, even if Global's subsequent *blocking* of such calls were inadmissible under Rule 407, its *admissions* that "440" or "4407" was not a valid sequence and that such calls should not have been completed would not be barred by the rule. *See* F.R.E. 801(d)(2).

terminated. The facts surrounding that issue are in dispute and are not appropriate for summary judgment.

## D. Payphone Surcharges

Global has demanded reimbursement from Locus for certain federally-mandated payphone surcharges. Locus disputed those charges on the ground that Global had not presented sufficient proof to support the imposition of those charges on Locus. *See* Lee Aff. (Dkt. # 48–2) ¶¶ 51–57; Castro Aff. (Dkt. # 48–4) ¶¶ 86, 87.

Locus's counterclaim, however, makes no mention of these surcharges. *See* Dkt. # 4 at 8–18. In addition, Global has submitted copies of email correspondence between the parties' counsel in which Locus's attorneys twice confirmed that Locus's "disputes are limited to the inbound minutes and 44–07 dialing code sequence per Interrogatory # 11." Dkt. # 54–3 at 2, 3.[11] Locus's motion papers do not appear to respond to Global's contention that Locus failed to raise this issue in its counterclaim or during discovery.

██ It is well established that a party cannot assert a claim for the first time in its motion papers. *See Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir.2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment"); *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir.1998) (plaintiff failed to state a securities fraud claim based on alleged failure to correct false financial information contained in prospectus, since "an alleged duty to correct d[id] not appear anywhere in the amended complaint and did not enter the case until Wright mentioned it for the first time in her opposition memoranda to the motion to dismiss"), *cert. denied*, 525 U.S. 1104, 119 S.Ct. 870, 142 L.Ed.2d 772 (1999); *Allah v. Poole*, 506 F.Supp.2d 174, 193 (W.D.N.Y. 2007) ("a memorandum of law or other motion papers are not proper vehicles by which to raise claims that are not asserted in the complaint"); *accord Ribis v. Mike Barnard Chevrolet–Cadillac, Inc.*, 468 F.Supp.2d 489, 495 (W.D.N.Y.2007). Any claim by Locus concerning payphone surcharges has therefore been waived. *See Essex Ins. Co. v. Rodgers Bros. Services, Inc.*, No. 8:05–CV–648R27TBM, 2006 WL 2356036, at *1 (M.D.Fla. Aug. 11, 2006) ("By failing to raise a counterclaim for reformation against Essex in its Answer in the underlying action, Rodgers Bros. waived its reformation claim in this third-party case"); *Hartford Fire Ins. Co. v. P & H Cattle Co., Inc.*, 451 F.Supp.2d 1262, 1274 (D.Kan.2006) (defendants' "failure to raise lack of consideration as a defense in their answer waives the defense").

## V. Whether some of Global's Claims Are Time–Barred

Locus contends that Global's claims for charges that were due on or before Febru-

---

11. Global's Interrogatory # 11 stated asked Locus to "[i]dentify and describe in detail all facts upon which [Locus] rel[ied] in support of [its] contention in Paragraph 55 of [Locus's] Counter–Claim that Global Crossing sent [Locus] invoices for rates other than those required in the Agreement." Dkt. # 41–6 at 10. Paragraph 55 of Locus's counterclaim alleges that "[o]n numerous occasions Global Crossing invoiced Locus for rates other than those required by the Agreement." Dkt. # 4.

Locus's response to Interrogatory # 11 states that "[t]he Agreement does not provide for nor authorize GC to charge rates that are not listed in the rate attachments or for rates for which there is no code listed." Dkt. # 41–6 at 10. Locus stated that the relevant facts and evidence supporting these allegations were contained at certain parts of the record, none of which appears to mention payphone surcharges.

ary 5, 2004 are barred by § 415(a) of the FCA, which provides that actions by carriers for recovery of their lawful charges must be brought "within two years from the time the cause of action accrues...." Global does not appear to dispute that § 415 applies here, but contends that its causes of action did not accrue until less than two years prior to commencement of this action.[12]

In support of their respective arguments, both Global and Locus rely upon the decision by the Court of Appeals for the Third Circuit in *MCI Telecommunications Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086 (3d Cir.1995), *cert. denied*, 519 U.S. 815, 117 S.Ct. 64, 136 L.Ed.2d 25 (1996). In that case, the Third Circuit held that where the plaintiff MCI's tariff provided that "MCI's bills are payable upon receipt," but also that "[a]mounts not paid within 30 days after the date of the invoice will be considered past due," MCI's cause of action under § 415(a) did not accrue until the defendant's "obligations became past due 30 days after the date of a particular invoice, and [that] it [wa]s at that point that the two year clock started ticking." *Id.* at 1100–01.

 In the case at bar, Locus contends that Global's claims likewise accrued thirty days after the date of each invoice, which was the due date provided for by the Agreement. *See* Dkt. # 41–3 § 3.5. Global argues in response that because the Agreement provided for a dispute procedure whereby Locus could challenge the validity or correctness of Global's charges, Global's claims did not accrue, as to any

particular invoice, until Global denied Locus's dispute with respect to that invoice.

Global's argument is not persuasive. That Locus was permitted to dispute an invoice does not alter the fact that payment on that invoice was due thirty days after the date of the invoice. That is consistent with the provision in § 4 of the Agreement that if Locus filed a dispute over a given invoice, and "the dispute is resolved in Global Crossing's favor any amounts to be paid by Locus shall be subject to the late payment charges under Section 3.5 hereof *retroactive to the Due Date* of the disputed Invoice."[13] Dkt. # 41–3 at 8 (emphasis added). In other words, Locus could not extend the due date simply by filing a dispute; the due date would remain the same, and if the dispute was ultimately determined to be meritless, Locus would be liable for late payment charges.

In the same vein, Global should not be allowed to unilaterally toll its own limitations period under the FCA simply by delaying its formal denial of a dispute. Although § 4 of the Agreement provides that Global "will use reasonable efforts to resolve and communicate its resolution of the dispute within 30 Business Days of its receipt of the dispute notice," the Agreement does not obligate Global to issue a decision on a dispute within that time frame. *See also* Global's Reply Brief (Dkt. # 54) at 19 (stating that "Global Crossing was *not required* to complete its investigation and resolve all disputes within 30 days," but only "to use reasonable efforts

12. At page 26 of its reply brief (Dkt. # 54), Global states that "any FCA-based statute of limitations does not apply to Global Crossing's claims against Locus," but the gist of its arguments concerning § 415 is that the limitations period under the statute did not begin to run until Global denied Locus's various disputes. What Global appears to mean,

then, is that § 415 does not *bar* its claims, not that it has no application to them.

13. Section 3.5 provides that "[a]ny Invoice not properly disputed under Section 4 hereof and not paid by the Due Date shall bear late payment fees ... until paid."

to do so"). *Cf. MFS Int'l, Inc. v. International Telcom Ltd.,* 50 F.Supp.2d 517, 526 (E.D.Va.1999) (holding that carrier's cause of action for nonpayment of invoices accrued when payment became due, *i.e.,* 30 days after date of issuance of invoices, and stating that "[a]ny other conclusion 'would allow a claimant to trigger the statute of limitations upon presentation of a claim rather than having the existence of a claim trigger the statute of limitations'") (quoting *Metromedia Co. v. Hartz Mountain Assocs.,* 139 N.J. 532, 655 A.2d 1379 (1995)).

In any event, regardless of when Global resolved a dispute, the due date for payment, under the terms of the agreement, remained thirty days after the date of the invoice. That is when Global's causes of action for nonpayment accrued. *See MCI Telecommunications,* 71 F.3d at 1100 (court "must give these words [in MCI's tariff, concerning the due date for payment of its bills] their ordinary meaning"). Accordingly, Global's claims are time-barred to the extent that they accrued prior to February 6, 2004.[14]

▮ Global also contends that even if some of its claims are time-barred, those claims may nevertheless be used as a set-off against Locus's counterclaims. ("Under the doctrine of equitable recoupment, [respondent's counterclaim], which relates to the transactions and occurrences pleaded by petitioner, may be utilized by respondent to defend against and offset any liability that respondent otherwise might incur on petitioner's claims, irrespective of whether the counterclaim is itself time-barred"). *In re Watson,* 8 A.D.3d 1092, 1094, 778 N.Y.S.2d 658 (4th Dep't 2004) (citing N.Y.C.P.L.R. § 203(d)).[15] *See also American Stock Exchange, LLC v. Mopex, Inc.,* 230 F.Supp.2d 333, 335 (S.D.N.Y. 2002) ("under [C.P.L.R.] Section 203(d), counterclaims that would otherwise be time-barred at the time the complaint is filed may be asserted as claims for equitable recoupment if they" "arose from the transactions, occurrences, or series of transactions or occurrences, upon which a claim asserted in the complaint depends") (quoting N.Y.C.P.L.R. § 203(d)).

"The purpose of recoupment and the reason it can revive a time-barred claim is to deter a plaintiff from waiting to file his or her action until a defendant's defenses

---

**14.** Although Global does not appear to raise this issue, *see* n. 10 *supra,* I note that the two-year limitations period of the FCA applies here, regardless of the fact that Global's claims are premised on state law. *See MFS Int'l,* 50 F.Supp.2d at 520–24 ("§ 415(b) … is not limited to claims brought under the FCA," but "instead reaches 'all complaints against carriers for the recovery of damages not based on overcharges,'" which "plainly encompass[ed]" carrier's and customer's claims against each other premised on state law); *see also Firstcom, Inc. v. Qwest Communications,* No. 06–4582, 2007 WL 2885773, at *3 (D.Minn. Sept. 27, 2007) (because reseller's state-law claims against carrier fell within "broad definition" of claims against carriers in § 415(c), claims had to be filed within two years after they accrued); *AT & T Communications of the Midwest v. Qwest Corp.,* No. ___, 2007 WL 2743491, at *2 (D.Neb.

Feb. 27, 2007) ("AT & T may not avoid the two-year statute of limitations contained in § 415 simply by characterizing its claims as state law claims").

**15.** C.P.L.R. § 203(d) provides:

**Defense or counterclaim.** A defense or counterclaim is interposed when a pleading containing it is served. A defense or counterclaim is not barred if it was not barred at the time the claims asserted in the complaint were interposed; except that if the defense or counterclaim arose from the transactions, occurrences, or series of transactions or occurrences, upon which a claim asserted in the complaint depends, it is not barred to the extent of the demand in the complaint notwithstanding that it was barred at the time the claims asserted in the complaint were interposed.

to the action are time-barred." *Ackerman v. National Property Analysts, Inc.*, 887 F.Supp. 494, 509 (S.D.N.Y.1992). "[F]or the doctrine to apply, the defendant's counterclaim or affirmative defense must arise out of the same transaction or series of transactions that form the basis of, and must be sufficiently related to, the causes of action alleged in the plaintiff's complaint." *182 Franklin Street Holding Corp. v. Franklin Pierrepont Associates*, 217 A.D.2d 508, 509, 630 N.Y.S.2d 64 (1st Dep't 1995) ((citing *SCM Corp. v. Fisher Park Lane Co.*, 40 N.Y.2d 788, 791, 390 N.Y.S.2d 398, 358 N.E.2d 1024 (1976))). *Gentile v. County of Suffolk*, 711 F.Supp. 724, 726 (E.D.N.Y.1989) ("N.Y.C.P.L.R. § 203(c) allows a time barred counterclaim to be asserted as a set off if it arose from the same 'transactions, occurrences, or series of transactions or occurrences' which are the basis of the plaintiff's complaint").

Locus does not appear to dispute that Global's claims, even if time-barred, would be available to offset Locus's counterclaims, to the extent that they arise out of the same transactions as Locus's counterclaims. Thus, provided that Global can establish a factual and legal basis for those claims, they may be used for purposes of setoff. *See City of New York v. Cotroneo & Marino's United Elec. Co., Inc.*, 269 A.D.2d 154, 155, 703 N.Y.S.2d 79 (1st Dep't 2000) ("While the City's action for liquidated delay damages was properly dismissed as time-barred, it was error, in the contractor's action against the City, to preclude the City from asserting such damages as a setoff against any payments that would otherwise be due the contractor had there been no delay, and to grant the contractor summary judgment in that action").

## VI. Unjust Enrichment

Count II of Global's complaint asserts a claim for unjust enrichment. Locus con-

tends that the existence of the parties' Agreement precludes this claim as a matter of law. In support of that assertion, Locus cites authority that an unjust-enrichment claim cannot be maintained where a valid contract exists between the parties. *See IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142, 879 N.Y.S.2d 355, 907 N.E.2d 268 (2009) ("Where the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded"). Global agrees with that basic principle, but argues that it is entitled to plead incompatible causes of action in the alternative.

This litigation, however, has passed the pleading stage. Defendant has not moved to dismiss this cause of action for failure to state a claim, pursuant to Rule 12(b)(6), but for summary judgment. It is clear from the record, and undisputed, that a valid, enforceable contract existed between the parties, and that the Agreement governed the subject matter of the present dispute. Accordingly, Global's claim for unjust enrichment must be dismissed. *See Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 587–88 (2d Cir. 2006) ("all claims for unjust enrichment are dismissed as precluded under New York law and inconsistent with the Hospitals' own pleadings because we have found valid, enforceable contracts between Horizon and the Hospitals").

## VII. Account–Stated Claim

Count III of Global's complaint asserts an account-stated claim under New York law. Locus contends that this claim fails as a matter of law. Global does not ap-

pear to have responded to this argument, but in any event I agree that this claim must be dismissed.

■ "An account stated represents an *agreement* between the parties reflecting amounts due on prior transactions." *M & A Constr. Corp. v. McTague,* 21 A.D.3d 610, 611, 800 N.Y.S.2d 235 (3d Dep't 2005) (emphasis added). *See also Enviroclean Services, LLC v. Cem, Inc.,* 12 A.D.3d 1042, 1043, 785 N.Y.S.2d 641 (4th Dep't 2004) ("An account stated is nothing more or less than a contract express or implied between the parties. It is an agreement which they have come to, regarding the amount due on past transactions") (quoting *Rodkinson v. Haecker,* 248 N.Y. 480, 484–485, 162 N.E. 493 (1928)); *Jim–Mar Corp. v. Aquatic Const., Ltd.,* 195 A.D.2d 868, 869, 600 N.Y.S.2d 790 (3d Dep't) ("An account stated is an agreement between parties to an account based upon prior transactions between them with respect to the correctness of the account items and balance due"), *leave to appeal denied,* 82 N.Y.2d 660, 605 N.Y.S.2d 6, 625 N.E.2d 591 (1993).

■ In order to make out such a claim, then, the plaintiff must plead and show that: "(1) an account was presented; (2) it was accepted as correct; and (3) debtor promised to pay the amount stated." *The Haskell Co. v. Radiant Energy Corp.,* No. 05–CV–4403, 2007 WL 2746903, at *12 (E.D.N.Y. Sept. 19, 2007). *See also Eastman Kodak Co. v. W.H. Henken Industries, Inc.,* No. 05–CV–6425, 2007 WL 1726472, at *3 (W.D.N.Y. June 14, 2007) ("To recover under a theory of an 'account stated,' a plaintiff must demonstrate 'an agreement between the parties to an account based upon prior transactions between them' ") (citing *LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham,* 185 F.3d 61, 64 (2d Cir.1999)) (citation and internal quotation marks omitted).

■ Although the requisite agreement may be either express or implied, *see J.B.H., Inc. v. Godinez,* 34 A.D.3d 873, 874–75, 823 N.Y.S.2d 576 (3d Dep't 2006), neither an explicit nor an implicit agreement could be found to exist here. *See M & A Constr.,* 21 A.D.3d at 611–12, 800 N.Y.S.2d 235 ("Where ... there is any dispute regarding the correctness of the account, the cause of action fails"). Locus never expressly agreed to the correctness of the amounts at issue here, nor is there evidence that Locus failed to object to Global's invoices within a reasonable time, or that Locus made partial payment on those amounts. *See LeBoeuf, Lamb,* 185 F.3d at 64 (agreement may be implied if a party receiving a statement of account keeps it without objecting to it within a reasonable time or if the debtor makes partial payment); *Morrison Cohen Singer and Weinstein, LLP v. Waters,* 13 A.D.3d 51, 51, 786 N.Y.S.2d 155 (1st Dep't 2004) ("either retention of bills without objection or partial payment may give rise to an account stated"); *see, e.g., Ween v. Dow,* 35 A.D.3d 58, 62, 822 N.Y.S.2d 257 (1st Dep't 2006) (issues of fact existed as to whether both defendant's partial payments, and her retention of plaintiff's invoices "were, in fact, acquiescence to their correctness").

## VIII. Termination of the Agreement

There is a dispute between the parties concerning when, and by whom, the Agreement was terminated. Locus contends that Global terminated the Agreement, effective December 1, 2005, pursuant to Global's November 29, 2005 notice of default. Global contends that, as Global stated in its November 30, 2005 letter to Locus, Global revoked the November 29 notice, and substituted the November 30 letter in its place.

Although at first blush this one-day difference might seem to be inconsequential, the contents of the letters differed in two ways. First, while the November 29 letter demanded payment of Locus's past due balance of $1,603,998.12 by 5:00 p.m. on December 1, 2005, the November 30 letter stated that "$915,140.14 ... is the amount that must be paid by 5:00 PM EST Monday, December 5, 2005." Thus, both the amount demanded, and the deadline for payment were changed.

Locus contends that the November 30 letter was essentially a nullity because Global had already terminated the contract in its November 29 letter, effective December 1. Although by the terms of the November 29 letter the impending termination would not become effective until 5:00 p.m. on December 1, by which time Locus had received the November 30 letter purporting to revoke the November 29 default notice, Locus states that it had taken the November 29 letter "at face value" and, to protect its customers from interruption of their service, had already transferred them to another carrier. Locus's Mem. of Law (Dkt. # 48) at 34. In a letter to Global dated December 1, 2005, Locus's attorney Charles Helein stated that "the Notice of Default dated November 29, 2005 ... is being honored. Your Notice of Default of today's date is inoperative." Dkt. # 48–3 at 24.

The significance of this lies in the fact that Locus's November billing cycle ran from November 6 to December 5, 2005. Locus contends that one reason, if not the only reason, why Global attempted to revoke its November 29 default notice and substitute the November 30 notice in its place is that Locus had met its minimum usage commitments for November, thus avoiding the imposition of any MMUC for that billing cycle. According to Locus, Global believed that, by giving Locus until the close of business on December 5 to cure its alleged breach (instead of December 1, as indicated in the November 29 letter), Global could extend the life of the Agreement into the December billing cycle, and impose MMUCs for that billing cycle. The record does indicate that Locus assessed a $192,222.78 MMUC for December 2005, and that no MMUC was imposed for November. *See* Dkt. # 1–3 at 4.

As to the different dollar amounts in the two letters, the November 30 letter stated that although Locus's account had a total past due balance that was "greater than $915,140.14," only that amount had to be paid in order to cure Locus's alleged breach. That amount, the letter stated, was "for outbound issues, except for UK cellular. It also includes inbound, payphone, and LPC's [late payment charges] related to these issues."

Locus contends that this amounted to a concession by Global that Locus was not responsible for the disputed UK "4407" charges. Global responds that it had simply agreed to set that matter aside for the time being, to be resolved at some future date, after Locus had paid the rest of its outstanding balance.

Locus's arguments concerning the effective date of the termination and the alleged waiver of the 4407 charges are not entirely compatible, since on the one hand Locus argues that the November 30 letter was ineffective as to the termination date, yet at the same time Locus seeks to give effect to what it characterizes as Global's concession or recognition in the November 30 letter that Locus was not obligated to pay the disputed 4407 charges. It appears that Locus may recognize the contradictory nature of its arguments, since it states that the "undisputed facts ... warrant the finding that *either*" Global terminated the Agreement effective December 1, 2005,

and that Locus met its minimum usage amount for the November 2005 billing cycle, or that Global's November 30 letter constitutes an admission by Global that Locus is not responsible for the disputed 4407 charges. *See* Locus's Mem. of Law (Dkt. # 48) at 32–33.

With respect to the latter issue, I do not believe that the November 30 letter can reasonably be interpreted as a concession that Locus was not liable for 4407 charges. In fact, the letter itself stated, in underlined text: "Please note that payment of the full amount indicated above [$915,-140.14] will merely cure one breach that could result in termination of service as set forth herein. Global Crossing retains all rights that it has under the Carrier Services Agreement with respect to the remaining balance due and owing." The letter could hardly have been more explicit in that regard.

Concerning the termination date, Global contends that the November 29 letter did not state that Global intended to terminate Locus's service. The November 29 letter simply stated that if Locus's breach were not cured by 5:00 p.m. on December 1, "Global Crossing *may* pursue its remedies outlined in your Carrier Service Agreement, which *may* include service termination." (Emphases added.)

The letter also stated, however, that "[s]hould termination result, Global Crossing will *immediately* terminate services as of 5:00 PM EDT Thursday, December 1...." (Emphasis added.) Locus argues, not unreasonably, that it should not have had to wait until 5:00 p.m. on December 1 to find out if Global was in fact going to terminate its services.

 In my view, there is an issue of fact concerning whether and when Global or Locus terminated the Agreement. Section 5.3 of the Agreement provided that "Global Crossing may, upon written notice, immediately terminate this Agreement for (I) Locus's failure to pay any delinquent invoice, or (ii) to pay [sic] any security or additional security within the time-frame required under this Agreement." In addition, § 5.5 provided that "[u]pon any material breach by Locus not cured after expiration of any applicable notice and cure periods, if any, Global Crossing may at its sole option do any or all" of several steps, including termination of the Agreement and its services. In light of those provisions, it is simply not clear on these facts whether Global's November 29 letter constituted a termination of the Agreement, or if the November 30 letter (which was apparently not received by Locus under December 1) effectively revoked the November 29 notice of default. It is also not possible to determine as a matter of law whether Locus acted reasonably in treating the November 29 letter as "operative," notwithstanding its purported revocation by Global, and essentially treating the Agreement as terminated as of December 1, 2005.

As with any other matter, where material issues of fact exist concerning performance, breach or termination of a contract, summary judgment on a breach of contract claim is inappropriate. *See Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.,* 500 F.3d 171, 186 (2d Cir.2007) (stating that "[u]nder New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach," and that "[t]he issue of whether a party has substantially performed is usually a question of fact"); *see, e.g., 24/7 Records, Inc. v. Sony Music Entertainment, Inc.,* 429 F.3d 39, 43–45 (2d Cir.2005) (district court erred in granting summary judgment for defendant record distributor on plaintiff producer's claim

that distributor breached distribution agreement by terminating it altogether, where evidence was conflicting about whether agreement had been terminated); *Corallo v. Merrick Cent. Carburetor, Inc.*, 733 F.2d 248, 252 (2d Cir.1984) ("Because of disparities in the parties' factual representations, the issue of contract termination and arbitrability simply does not lend itself to summary disposition"); *Abiele Contracting, Inc. v. New York City School Const. Auth.*, 256 A.D.2d 494, 495, 682 N.Y.S.2d 419 (2d Dep't 1998) (issues of fact existed as to the efficacy of the defendant's purported termination of the parties' contract, and whether plaintiff could have cured its default had it been afforded an opportunity to do so); *Boston Concessions Group, Inc. v. Criterion Center Corp.*, 250 A.D.2d 435, 436, 673 N.Y.S.2d 111 (1st Dep't 1998) ("Concerning the breach of contract cause of action, numerous issues of fact exist, including . . . whether defendant terminated the agreement . . . and the validity of defendant's termination"). Because such issues exist here concerning the date of termination of the parties' Agreement, the Court cannot determine as a matter of law whether the MMUC imposed by Global for December 2005 was appropriate.

## IX. Relief

The Court concludes, then, that Global is entitled to judgment as a matter of law with respect to the inbound-minutes charges and the payphone surcharges. As the Court concluded in a similar action, however, "I do not believe that it would be advisable to enter judgment at this time in Global's favor on these claims, since some of defendant['s] counterclaims remain pending and may eventually offset the amounts to which Global is entitled." *OLS*, 566 F.Supp.2d at 215. As explained above, a number of factual issues remain undecided. In addition, Locus contends

that Global failed to credit Locus for its final payment, in the relatively modest amount of $2222.64. To attempt to arrive at a precise dollar figure of Global's damages at this point, then, would be not only difficult, but pointless, since the ultimate relief that either party is entitled to here has yet to be determined.

## X. Summary

Given the numerous claims and issues presented here, a summary of the Court's rulings may be useful. Count II of Global's complaint, alleging claims sounding in quantum meruit, unjust enrichment, and constructive trust and Count III of the complaint, alleging an account-stated claim, are dismissed.

Count I, the breach of contract claim, survives, but is time-barred to the extent that it seeks recovery of charges due on or before February 5, 2004. Time-barred claims may be used as an offset against Locus's counterclaim, however, to the extent that Global's and Locus's claims arise out of the same transactions.

Global is not barred as a matter of law from seeking to recover MMUCs. Whether Global is entitled to recover such charges, however, depends on the resolution of certain factual issues concerning the termination of the Agreement.

Count IV of the complaint does not assert any independent basis for relief, but simply seeks enforcement of Global's security interest under its security agreement with Locus. It is a precondition of such relief, however, that Global demonstrate Locus's breach of the underlying Agreement. Count IV survives, then, but whether Global is entitled to recover on that claim depends, in part, on whether Global prevails on Count I.

Counts II and III of Locus's counterclaim, alleging claims under the FCA, are barred by virtue of Global's bankruptcy proceedings. Count I of the counterclaim,

alleging breach of contract, is not so barred, but is dismissed to the extent that it is based on the inbound-minutes charges, and on the payphone surcharges.

Count I of the counterclaim survives, then, with respect to the 4407 calls to the UK, but whether Locus can recover on Count I cannot be determined at this time. Issues of fact exist concerning whether Locus complied with the contractual dispute procedures, and if not, whether the parties' course of conduct demonstrates that strict compliance with those procedures was considered to be unnecessary.

## CONCLUSION

Plaintiff Global Crossing Bandwidth, Inc.'s motion for summary judgment (Dkt. # 40) is granted in part and denied in part. Counts II and III of defendant Locus Telecommunications, Inc.'s counterclaim are dismissed. Count I of defendant's counterclaim is dismissed insofar as it asserts a claim based on alleged overcharges for inbound minutes and payphone surcharges. In all other respects, plaintiff's motion is denied.

Defendant Locus Telecommunications, Inc.'s motion for summary judgment (Dkt. # 47) is granted in part and denied in part. Judgment is entered in favor of defendant, pursuant to Fed.R.Civ.P. 56(d), with respect to defendant's allegation that the charges imposed on it by plaintiff for calls to the United Kingdom that were made using the "4407" sequence are invalid. Counts II and III of the complaint are dismissed in its entirety. Count I is dismissed to the extent that the claims asserted in Count I accrued prior to February 6, 2004. In all other respects, defendant's motion is denied.

IT IS SO ORDERED.